**Delara NASSERI, Petitioner–Appellant,**

v.

**Robert MOSCHORAK, District Director, U.S. Immigration and Naturalization Service, Respondent–Appellee.**

No. 93–55997.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 5, 1994.

Filed Sept. 14, 1994.

---

Lea Greenberger, Encino, CA, Judith Wood and Jesse A. Moorman, Los Angeles, CA, for petitioner-appellant.

John L. Lee, Asst. U.S. Atty., Los Angeles, CA, for respondent-appellee.

Before: D.W. NELSON and NOONAN, Circuit Judges, and SAMUEL P. KING,* District Judge.

D.W. NELSON, Circuit Judge:

Delara Nasseri appeals the district court's judgment denying her petition for a writ of habeas corpus contesting a final order of exclusion. The district court affirmed the decision of the Board of Immigration Appeals ("the Board") finding her excludable under 8 U.S.C. §§ 1158 and 1253(h), and denying her application for asylum and withholding of deportation under 8 U.S.C. §§ 1158(a) and 1253(h). We reverse the decision of the district court, grant the petition, and remand to the district court to issue the writ of habeas corpus.

## FACTUAL AND PROCEDURAL BACKGROUND

Delara Nasseri is a thirty-nine year old native and citizen of Afghanistan. She was detained by the Immigration and Naturalization Service ("Service") when she attempted to enter the United States on June, 14, 1992. The Service initiated exclusion proceedings, and she applied for asylum and withholding of deportation. The following overview of the facts is taken from Nasseri's testimony before the Immigration Judge ("IJ").

From 1977 to 1991, Nasseri worked as a teacher in a public elementary school in Kabul, where she lived with her husband and four children. She was an active member of the Moslem League Group, also known as the National Islamic Front for Afghanistan (NIFA). The group, which advocated the return of a constitutional monarchy under King Sahir Shah, opposed both the communist regime that was in power at the time Nasseri left Afghanistan and the fundamentalist factions of the mujahidin who have since seized control of the government. Nasseri attended regular, private meetings and also engaged in public activities such as the distribution of leaflets. Her participation in NIFA, along with her work as a teacher, led mujahidin rebels to torture her, to bomb her parents' house, and to place her under surveillance.

In January 1990, armed men invaded Nasseri's home at night, kidnapped her, and imprisoned her in a government building at one of the ministries in Kabul. She was held in a dark basement room for nearly a month. In an attempt to discover information about

* The Honorable Samuel P. King, United States District Judge for the District of Hawaii, sitting by designation.

the political group she supported, her kidnappers repeatedly tortured and interrogated her. They beat her with fists and a stick, threatened her with a gun, and forced her to sleep on a cold floor covered with water. Nasseri concluded that her kidnappers belonged to fundamentalist mujahidin rebel groups when one of them declared that the mujahidin still had power, in spite of communist rule, and would destroy people like her. She believes that they eventually released her because she was sick, because she did not provide them with any information, and because they may have wanted to follow her to gather more evidence against her. She experiences headaches from being beaten on the head and is suffering from back pain from sleeping on the floor.

After her release, followers of Hekmatyar, one of the fundamentalist factions of the mujahidin, confronted her and intimated that they had tortured her because she was working in opposition to the mujahidin. As a result of this confrontation and several other similar incidents, Nasseri became convinced that members of two mujahidin groups, one led by Hekmatyar and one led by Sayyaf, were responsible for her torture and were continuing to monitor her activities. She sold her household possessions and moved into her parents' house, which she believed would be safer than her former residence. In January 1991, her parents' house was bombed, and her aunt and uncle were injured. Several months later, in April 1991, her brothers noticed a group of people looking for her. To protect herself and her family, Nasseri fled with her husband and four children to India on February 19, 1992.

In India, two men attempted to abduct Nasseri while she was shopping in the marketplace. She believes that one of the men belonged to the Hekmatyar faction and the other to the Sayyaf faction. Two weeks after this incident, on June 14, 1992, she left India for the United States. Her husband and four children are still living in India.

In its decision of August 11, 1992, the IJ found Nasseri to be excludable under sections 212(a)(5)(A)(i) and 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act ("the Act"), 8 U.S.C. §§ 1158 and 1253(h), and denied her application for asylum and withholding of deportation under sections 208(a) and 243(h) of the Act, 8 U.S.C. §§ 1158(a), 1253(h). In support of her application, Nasseri provided oral testimony and several newspaper articles describing the political turmoil in Afghanistan.

The IJ based its decision primarily on a finding that Nasseri's testimony was not credible. The IJ did not discredit Nasseri's account because of her demeanor or because of inconsistencies in her testimony, however. On the contrary, the IJ noted that "the applicant testified in an honest and forthright manner." The IJ concluded that Nasseri's account was implausible mainly because of "her failure to explain why Afghani Rebel Forces allegedly followed her from Afghanistan to India and then tried to torture her there." The IJ relied on an advisory opinion prepared by the State Department Bureau of Human Rights and Humanitarian Affairs (BHRHA) assessing Nasseri's case. While the BHRHA advisory opinion did not make a recommendation to grant or deny asylum, the opinion stated that "[i]t seems rather unusual to us that these persons, described by the applicant as her 'enemies', would follow her all the way to India." Nasseri contends that the assertions contained in the BHRHA report, and thus the IJ's decision, are mistaken, because she did not claim that she was followed to India but rather that she was "tracked down in India."

After conducting a *de novo* review of the record, the Board affirmed the decision of the IJ. As the IJ had, the Board rested its decision on a finding that Nasseri's testimony was not credible. Before the Board, Nasseri introduced affidavits from her husband corroborating her testimony, a letter from NIFA attesting to her membership, an affidavit from a former political assistant to the United States Embassy in Kabul stating that Nasseri was a well-known opponent of the communist regime and the fundamentalist rebels, documents describing the political upheaval in Afghanistan, and several additional documents. The Board based its adverse credibility finding both on the presumed implausibility of Nasseri's claim that she was

followed to India and on several other factors.

Nasseri then filed a petition for a writ of habeas corpus in the District Court for the Central District of California. Adopting the recommendations of a magistrate judge, the district court dismissed the petition on June 23, 1993. We have jurisdiction under 28 U.S.C. § 2253 and 8 U.S.C. § 1105a(b).

### STANDARD OF REVIEW

■ The decision whether to grant or deny a petition for habeas corpus is reviewed *de novo*. *Desir v. Ilchert*, 840 F.2d 723, 726 (9th Cir.1988). We review factual determinations underlying the Board's decision under the substantial evidence standard. *INS v. Elias–Zacarias*, 502 U.S. 478, ——, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992); *see also Ghebllawi v. INS*, 28 F.3d 83, 86 (9th Cir. 1994) clarifying that the *Elias–Zacarias* Court did not intend to alter the "normal principles of administrative review").

### DISCUSSION

#### I. CREDIBILITY FINDINGS

The Board upheld the IJ's decision denying Nasseri's request for asylum after conducting a *de novo* review of her claims and determining that the IJ's adverse credibility finding was correct.[1] The Board relied on Nasseri's description of three alleged incidents of persecution: her detention and torture in Kabul, the mujahidin's subsequent efforts to place her under surveillance, and the attempt of mujahidin supporters to kidnap her after she had fled to India. The record does not support the Board's conclusions.

■ We accord substantial deference to credibility findings, but these findings must be supported by "specific, cogent reasons." *Turcios v. INS*, 821 F.2d 1396, 1399 (9th Cir.1987) (citations omitted). Furthermore, reasons alone are not sufficient. The reasons offered must be "substantial and must

bear a legitimate nexus to the finding." *Aguilera–Cota v. INS*, 914 F.2d 1375, 1381 (9th Cir.1990). We are also bound to consider whether or not the reasons given are "valid grounds" for determining that a witness is not credible. *Vilorio–Lopez v. INS*, 852 F.2d 1137, 1142 (9th Cir.1988). In cases such as this one, in which the petitioner's testimony is the principal source of evidence, it is especially important "that the credibility determination be based on appropriate factors." *Aguilera–Cota*, 914 F.2d at 1381.

The Board did not rest its adverse credibility finding on anything other than faulty logic. In discounting Nasseri's account of the three incidents of persecution, the Board did not conclude that Nasseri's demeanor undermined her testimony or that her narrative was flawed because of inconsistencies. Indeed, the Board acknowledged the IJ's finding that Nasseri "testified in an honest and forthright manner and her testimony was consistent with her application." Instead, the Board based its conclusion that her testimony did not seem plausible on its analysis of the political situation in Afghanistan. This analysis, however, is not supported by the record, and, in many instances, the evidence in the record directly contradicts the Board's assertions.

#### A. Nasseri's Detention and Torture in Kabul

The Board argued that Nasseri's account of her 1990 imprisonment and torture was implausible because it "seems far more consistent with detention by the former [Communist] Government of Afghanistan than by the mujahidin." The Board reached this conclusion for four reasons. First, the Board stated that it is "implausible that in January 1990 mujahidin members would have had access to a detention center at the Ministry of the Interior or any of the other ministry buildings in Kabul." Second, the Board asserted that "it seems unlikely" that Nasseri's husband would have discovered the location of her detention, as she testified, by receiving

---

1. Although the Board did not say so explicitly, it is clear from the language of the decision that the Board conducted a *de novo* review. The Board stated, "After a careful examination of the

record, we conclude that it supports an adverse credibility finding in this case." The Board then proceeded to give a fresh analysis of each of Nasseri's claims.

information from someone in an office in Kabul. Third, the Board found it "difficult to believe" that, in 1990, while still focused on ousting the communist regime, "the mujahidin would have expended so much effort to interrogate the applicant about the membership and the anti-government plans of her secret political group." Fourth, the Board noted that "it does not make sense that one of her interrogators would have tried to disabuse her of the idea that the mujahidin had been defeated by the communists" when the likelihood of mujahidin victory over the communists was "generally regarded as good."

In drawing these conclusions, the Board did not cite any evidence for support, and there is none. Indeed, the Board conceded that Nasseri was tortured, but argued that the communists, rather than the mujahidin, are more likely to have been responsible. The reasoning supporting this argument often defies logic. The Board's assertion that Nasseri's account was implausible because the likelihood of mujahidin victory over the communists was "generally regarded as good" is utterly lacking in persuasiveness. Even if a mujahidin victory over the communists was "generally accepted" as imminent, it would have made sense for a mujahidin supporter to emphasize mujahidin power to Nasseri, who opposed the mujahidin.

Moreover, the evidence that we do have concerning conditions in Afghanistan directly undermines the Board's analysis. The 1992 Amnesty International report on Afghanistan, offered by Nasseri as background evidence, notes that the mujahidin regularly have detained, tortured, and summarily executed members of the population, including schoolteachers such as Nasseri. The 1991 State Department report on human rights conditions in Afghanistan, of which we take judicial notice,. see *Shirazi–Parsa v. INS,* 14 F.3d 1424, 1428 (9th Cir.1994) (taking judicial notice of State Department report the Board did not consider), further contradicts the Board's assertions. The report states that at the time of Nasseri's alleged detention, "various resistance groups" maintained "prisons, both inside Afghanistan and in refugee camps in Pakistan." The report notes that prisoners detained by these groups were

"routinely subject[ed] ... to torture" and that among the rebel factions "most frequently linked to these prisons and cited for poor prisoner treatment" is the Hekmatyar faction, the group Nasseri states abducted her. The State Department report thus directly lends credibility to Nasseri's assertions.

## B. Surveillance

The Board's decision to discredit Nasseri's claim that she was watched and followed in Afghanistan is similarly unsupported by evidence or sound logic. The Board stated that Nasseri's suggestion that the mujahidin tracked her movements in order to gain evidence to "rearrest" her "reflects a concern with due process that seems unusual for an anti-government guerilla group." Again, the Board did not refer to anything in the record in drawing this conclusion. The 1991 State Department report, however, directly undermines the Board's premise. According to the 1991 report, rebels were known to conduct trials of their opponents under Shari'a, Islamic law, lending credibility to Nasseri's speculation that the people watching her were seeking to obtain evidence against her. Even if the mujahidin had not been known to conduct extra-legal Shari'a trials, it would have been logical for them to attempt to obtain more information about the political activities of someone they believed to be a political enemy.

The Board also stated that the alleged interest of the rebels in obtaining evidence against Nasseri and information about her political group was "inconsistent with the mujahidin deliberately bombing her house, thus risking having her die or flee to an unknown location where they could not follow her." Nasseri testified that she thought at least two rebel groups, followers of Hekmatyar and followers of Sayyaf, menaced her. Therefore, as she argues in her brief, if other portions of her account are accepted as true, it is not implausible that one faction would want to follow her and another would want to bomb her house. As Nasseri emphasizes, the Board's conclusion assumes a unified guerrilla command that has a single, unwavering, well-coordinated plan for Nasseri.

The Board does not provide any basis for making such an assumption, and it seems inherently implausible in light of the political turmoil in Afghanistan described in the record. Moreover, the 1991 State Department report states that bombings by mujahidin rebels were common during this period.

### C. The Attempted Kidnapping of Nasseri in India

In criticizing Nasseri's report of her attempted abduction in India, the Board, like the IJ,[2] relied on the mistaken description of Nasseri's testimony contained in the BHRHA report. The BHRHA stated that Nasseri claimed that mujahidin rebels *followed* her to India. Nasseri's asylum application did not state that she thought she was followed to India but rather that she was "tracked down" by her "enemies" while she was in India, suggesting that her pursuers may have been Afghani rebel forces already residing there. She did not state at any point that she thought she was followed to India. This distinction is important because although it may be implausible that rebels would take the time to leave Afghanistan and follow her to India, it is not at all implausible that rebels pursuing the revolutionary cause in India, who became aware of the presence of a political enemy, would attempt to harm that enemy.

Because the IJ found that Nasseri testified in an "honest and forthright" manner, and because the reasons for discounting her account are without basis in the record, we conclude that the Board erred in discrediting Nasseri's testimony.

## II. ASYLUM AND WITHHOLDING OF DEPORTATION

Because we conclude that Nasseri's testimony should be credited, we turn to Nasseri's claims that she is entitled to withholding and eligible for asylum. The Board did not discuss these two claims. The IJ, however, concluded that even if Nasseri's testimony were accepted as true, she would not have established her eligibility for asylum or withholding of deportation. We disagree.[3]

### A. Withholding of Deportation

■ To establish that she is entitled to withholding of deportation, Nasseri must show that "her life or freedom would be threatened" on account of race, religion, nationality, membership in a particular social group, or political opinion were she to return to Afghanistan. 8 U.S.C. § 1253(h)(1). We have held that, to satisfy this statutory requirement, a petitioner must demonstrate a "clear probability" that she will be persecuted by presenting concrete evidence that the probability of persecution is "more likely than not." *See, e.g., Cardoza–Fonseca v. INS*, 767 F.2d 1448, 1452 (9th Cir.1985), *aff'd*, 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). We conclude that Nasseri has met her burden.

The evidence in the record supporting Nasseri's claim of probable persecution is overwhelming. She has clearly satisfied the requirement that she present evidence of "objective realities" in Afghanistan establishing a basis for her claim. *Cardoza–Fonseca*, 767 F.2d at 1452. Nasseri reported that mujahidin rebels tortured her, monitored her activities, bombed her parents' house, and harassed her in India, and the Board does not contest her assertion that she was tortured in Afghanistan. Although we have stated that a petitioner may satisfy her burden with testimonial evidence alone, *see, e.g., Bolanos–Hernandez v. INS*, 767 F.2d 1277, 1285 (9th Cir.1984) (noting that "[p]ersecu-

---

2. The sole basis of the IJ's adverse credibility finding was its mistrust of her account of the kidnapping in India. The Board added the other reasons for doubting Nasseri's testimony. The IJ, however, stated other reasons for determining that Nasseri lacked a well-founded fear of persecution. We need not consider these reasons because the BIA, after conducting a de novo review of the proceedings, did not rely on them. *Yepes–Prado v. INS*, 10 F.3d 1363, 1366 (9th Cir.1993) ("[W]here the BIA engages in *de novo* review of

the IJ's factual and legal determinations, we consider only the decision of the BIA.").

3. Nasseri also claims that she received ineffective assistance of counsel and that the translation provided was inadequate, thus depriving her of due process. *See Mohsseni Behbahani v. INS*, 796 F.2d 249, 251 n. 1 (9th Cir.1986). Because we conclude that she is entitled to withholding of deportation, we need not reach these issues.

tors are hardly likely to provide their victims with affidavits attesting to their acts of persecution"), Nasseri has provided numerous documents in addition to her testimony. She submitted two affidavits from her husband, corroborating her account of the kidnapping in Kabul, the bombing of her parents' house, and the attempted kidnapping in India.[4] She provided the affidavit of a former political assistant to the U.S. Embassy in Afghanistan stating that the mujahidin regard Nasseri as a political threat because she favors parliamentary democracy. She also provided other documents, including several reports describing widespread acts of torture, detention, and bombing committed by the mujahidin.

Nasseri also has demonstrated by overwhelming evidence that the likelihood of her future persecution is more probable than not. Crucial to a determination of the probability of persecution is "whether the group making the threat has the will or the ability to carry it out." *Bolanos–Hernandez,* 767 F.2d at 1285. Nasseri's case is unusually strong because the threat of future persecution here is rooted in numerous incidents of actual past persecution. *See Desir,* 840 F.2d at 729 (noting the significance of past persecution). The Amnesty International report and the State Department report indicate that the mujahidin continue to detain and torture individuals, such as Nasseri, who they believe are political enemies. Nasseri's testimony that the mujahidin abducted her, tortured her, interrogated her, placed her under surveillance in Kabul, and tracked her down after she fled to India, provides conclusive evidence that factions of the mujahidin believe her to be a political enemy. The evidence in the record thus compels the conclusion that, were she deported to Afghanistan, Nasseri more likely than not again would be subject to attacks on her life and freedom.

The government's argument that Nasseri did not meet her burden of showing persecution on account of political opinion is without merit. It is axiomatic that, to establish her entitlement to withholding before the Board, Nasseri was required to show that she likely would be subjected to persecution "on account of" her political beliefs or beliefs imputed to her by authorities in Afghanistan. *Elias–Zacarias,* 502 U.S. at ——, 112 S.Ct. at 815 (1992). As part of her burden, Nasseri was obligated to provide some evidence, direct or circumstantial, that her actual and would-be persecutors *intended* to harm her because of these beliefs. *Id.* at ——, 112 S.Ct. at 817. *See also Abedini v. INS,* 971 F.2d 188, 192 (9th Cir.1992). According to Nasseri's testimony, her kidnappers asked her "which group you're involved with ... who do you belong to, how many people in the group and what's their ... target." The government claims that these statements betray her attackers' ignorance of her membership in NIFA, and, therefore, demonstrate that they did not possess the requisite intent to persecute her because of her political beliefs.

The government's argument fails for two reasons. First, there is evidence in the record indicating that, even if her attackers were not aware of all details of her political affiliations, her political opposition to the mujahidin was publicly known. Contrary to the government's assertions, Nasseri did provide evidence that her participation in NIFA was public. Before the IJ, Nasseri testified that she was an active member of NIFA, a pro-monarchist, pro-democracy, pro-women's rights group. While she explained that the group met in secret, she also stated that she participated in the public distribution of leaflets and pamphlets in support of NIFA's cause. On appeal to the Board, she submitted the affidavit of a former political assistant to the United States Embassy in Afghanistan who stated that

> she became the target of fundamentalist groups after the collapse of the communist regime in Kabul, because she was not fighting for fundamentalism, but her ideals were to bring parliamentary democracy

---

4. In his account of the kidnapping, her husband stated, "the armed men intended to take my wife out of the house [but] I did not let them ... go.... I was also hit and beaten by them while my wife was crying and shouting[.] [W]hile my wife was crying and shouting they beat her and [took] ... her with them." He also reported that the "signs of hitting and torture" were "clearly visible" when his wife returned home.

... [to] Afghanistan. She was working for the former King Zaher Shah.... Since the collapse of the regime, the fundamentalists started [to] crack down on those political activists who were not supporting them.

Nasseri also submitted a letter from NIFA attesting to her membership. Furthermore, Nasseri testified that her role as a female teacher would have led the mujahidin to believe that she was an opponent to the fundamentalist cause.

Second, regardless of how her attackers came to view her as a threat, it is clear that they took action against her on account of opinions they imputed to her. Nasseri is not required to show that her involvement in NIFA or any other political group in particular motivated her attackers, but rather that they are likely to harm her in the future because of political opinions they believe she possesses. *Elias–Zacarias*, 502 U.S. at ——, 112 S.Ct. at 815. Nasseri's testimony that the mujahidin kidnapped her, placed her under surveillance, and bombed her parents' house established that the mujahidin acted with the intent to harm her because of her political beliefs. Her torturers' comments suggest that they may have been ignorant of the details of her participation in NIFA, but these same comments indicate that her attackers believed that Nasseri was a political enemy and were seeking to discover information about her political activities. It is difficult to imagine any other reason why the mujahidin would have abducted her, beat her, threatened her with a gun, and questioned her about her political contacts. The government has not offered one. Moreover, Nasseri's kidnappers did not merely question her, they tortured her, indicating that they were not simply trying to discover whether or not she held certain views but, rather, that they believed she knew something that she wasn't revealing. Their subsequent surveillance of Nasseri further establishes that they believed her to be a political enemy.

Other statements reported by Nasseri are also suggestive. She testified that during the interrogation, one of her torturers told her, "[You] want to be free.... [Y]ou think the Mujahideen is gone.... [but] the Muja-hideen [is] coming right now and we'll try to destroy you people." These comments indicate that her attackers believed she opposed the mujahidin, which is all that is necessary for her to demonstrate persecution. *Cf. Aguilera–Cota v. INS*, 914, F.2d 1375 (9th Cir.1990) (finding politically-neutral El Salvadoran petitioner eligible for asylum when he established that rebel forces imputed political opinions to him).

If Nasseri's testimony concerning the incident of torture shows that her attackers acted because of her political opinions or political opinions they were imputing to her, her account of subsequent events leaves no room for any other conclusion. Before the IJ, she stated that after she was tortured, a group of people came to her house and told her, "[Y]ou're doing something against our group ... and ... that's the reason we ... tortured you." She also claimed that members of the mujahidin followed her and bombed her parents' house. Here, there is no question that Nasseri was singled out for persecution and is likely to be singled out again because of her political opinions or opinions imputed to her.

## B. Political Asylum

It is well-settled that the section 1158(a) well-founded fear standard is less stringent than the section 1253(h) clear probability standard. *Cardoza–Fonseca*, 767 F.2d at 1451. Therefore, a petitioner who has demonstrated that she faces a clear probability of persecution *a fortiori* meets the well-founded fear standard. Accordingly, for the same reasons set forth in our analysis of Nasseri's withholding claim, we conclude that Nasseri has carried her burden of establishing her eligibility for asylum.

## CONCLUSION

For the reasons stated above, we reverse the judgment of the district court and grant Nasseri's petition. We remand to the district court with instructions to issue the writ and to remand the asylum claim so that the

Attorney General may exercise her discretion under 8 U.S.C. § 1158(a).[5]

5. Nasseri may wish to be granted asylum in addition to withholding of deportation because a grant of asylum entitles her to benefits that are not automatic with withholding of deportation relief. *See Blanco–Lopez v. INS,* 858 F.2d 531, 534 n. 2 (1988).