Leticia CORDON–GARCIA, Petitioner,

v.

**IMMIGRATION AND NATURALIZATION SERVICE,** Respondent.

No. 98–70464.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 6, 2000.

Decided March 3, 2000.

Garish Sarin, Law Offices of Garish Sarin, Los Angeles, California, for the petitioner.

Jeffrey J. Bernstein (Argued), and Christine A. Bither (On the Briefs), Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for the respondent.

Before: HALL, TROTT, and W. FLETCHER, Circuit Judges.

TROTT, Circuit Judge:

■ Leticia Cordon–Garcia ("Petitioner") petitions for review of a March 30, 1998, decision by the Board of Immigration Appeals ("BIA") affirming an Immigration Judge's ("IJ") denial of Petitioner's application for asylum and withholding of deportation. Petitioner claims persecution on the basis of imputed political opinion and membership in a particular social group. Because Petitioner failed to present her "social group" argument to the BIA, this court is limited to considering only her "imputed political opinion" argu-

ment. *See Farhoud v. INS*, 122 F.3d 794, 796 (9th Cir.1997) (absent limited exceptions, "[f]ailure to raise an issue below constitutes failure to exhaust administrative remedies and deprives this court of jurisdiction to hear the matter") (internal quotations omitted). This court has jurisdiction pursuant to section 309(c)(4)(A) & (D) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. 104–208, 110 Stat. 3009 (Sept. 30, 1996), and section 106(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1105a(a).[1] We grant the petition for review but remand the case to the BIA for credibility findings regarding Cordon–Garcia's testimony at the hearing before the IJ.

## BACKGROUND

Petitioner, a native and citizen of Guatemala, lived in the City of Zacapa until 1990. From 1988 to April 1990, she taught adult literacy classes at night in a nearby rural area called Aguablanca. She was employed by CONALFA, a government-funded literacy agency. Petitioner's testimony at the hearing before the IJ sets forth the following events, which form the basis of her asylum application.

One night in November 1989, the receptionist at Petitioner's school told Petitioner that a suspicious-looking man asked for the name of the person teaching her class in Aguablanca. The receptionist did not tell him Petitioner's name, and the man left. Two months later, the same man approached one of Petitioner's students and asked the student the name of the person teaching the class and when she would be finished that night. The student told the man Petitioner's name, but refused to divulge any further information.

---

1. IIRIRA repeals 8 U.S.C. § 1105a and replaces it with a new judicial review provision codified at 8 U.S.C. § 1252. *See* IIRIRA § 306(c)(1), Pub.L. No. 104–208, 100 Stat. 3009 (Sept. 30, 1996), as amended by Act of Oct. 11, 1996, Pub.L. No. 104–302, 110 Stat. 3656. However, because the new review provision does not apply to petitioners whose deportation proceedings commenced before April 1, 1997, we continue to have jurisdiction over the instant petition under 8 U.S.C. § 1105a, INA § 106(a). *See* IIRIRA § 309(c)(1).

One month later, in February 1990, the man met Petitioner as she left the school one night. He asked her if she was Leticia Cordon, which she confirmed. The man tied up her hands, blindfolded her, and took her to the bank of a nearby river. Once there, the man took the blindfold off, threw Petitioner to the ground, beat her, and told her that if she continued teaching classes for the government she and her family would be in danger.

The man told Petitioner that the guerrillas wanted her to work for them instead of for CONALFA and that they would explain everything once she joined them. The man indicated that the guerrillas did not want her to work for the government because the more literate the people are, the more difficult it is to "reach" and "persuade" them. Petitioner told the man she could not join the guerrillas as she already had a position at the school, to which he responded, "decide which one you're going to work with." The man told her to "think it over well," and then let her go as a warning.

Thereafter, until Petitioner left Guatemala, military aides in Zacapa accompanied her on her way to school. Petitioner learned from neighbors that in March 1990, three guerrillas were dissuaded from approaching her when they saw that she was accompanied. Petitioner left Guatemala the following month and entered the United States illegally on May 8, 1990.[2] The guerrillas continued to attempt to locate Petitioner after her departure. Petitioner testified at the IJ hearing that she thought the guerrillas continued to pursue her whereabouts "[b]ecause they thought that if I would be near there, somewhere nearby I would return or that perhaps I was doing the same thing"—teaching Guatemalans literacy—"at another place." The guerrillas' further attempts to locate Petitioner were described at the IJ hearing as follows.

In May 1990, the man who originally abducted Petitioner returned to the school and asked the receptionist whether Petitioner still taught there. The receptionist told the man that she did not know where Petitioner was, and the man accused her of covering for Petitioner. The man then returned in January 1991 and asked whether Petitioner had transferred somewhere else.

In September 1991, three guerrillas approached Petitioner's father in the fields as he worked and inquired as to Petitioner's whereabouts. A neighbor watched this encounter from behind some trees. When Petitioner's father refused to tell the men where Petitioner was, he was shot and killed. In October 1991, three guerrillas approached Petitioner's brother as he was working in the same field. Her brother admitted belonging to Petitioner's family, and the men asked for Petitioner's whereabouts. Before escaping, her brother told the men he did not know where she was, to which the men responded "if you don't tell us ... your mother and sister will be left without any man in the family." The brother was then able to escape from the men.

The authorities in Zacapa responded by protecting Petitioner's uncle as he worked in the field. The protection lasted for approximately a year and a half. Still, in March 1995, after the protection ceased, four guerrillas approached Petitioner's uncle as he worked in the fields. Petitioner's cousin was nearby on horseback. The men asked the uncle whether he belonged to Petitioner's family. This question prompted Petitioner's cousin to flee. Petitioner's uncle told the men he did not know where she was. When he tried to run away, he was shot, attacked with a machete, and killed.

The IJ denied Petitioner's application for asylum and withholding of deportation, citing in part both credibility concerns and her inability to establish that she suffered

---

2. At her hearing before the IJ, Petitioner conceded deportability, but applied for asylum, withholding from deportation, and voluntary departure.

any persecution on account of an imputed political opinion. The BIA dismissed Petitioner's subsequent appeal, but affirmed the IJ's decision to grant her voluntary departure.

## DISCUSSION

### A. Standard of Review

 Where the BIA reviews the IJ's decision de novo, our review is limited to the BIA's decision, except to the extent the IJ's opinion is expressly adopted. *Ghaly v. INS,* 58 F.3d 1425, 1430 (9th Cir.1995). The IJ's and the BIA's credibility findings are reviewed for "substantial evidence," *Singh–Kaur v. INS,* 183 F.3d 1147, 1149 (9th Cir.1999), as are all other factual findings. *Sangha v. INS,* 103 F.3d 1482, 1487 (9th Cir.1997). Substantial evidence is also the governing standard of review for the determination that Petitioner has not established eligibility for asylum. *See Singh v. INS,* 134 F.3d 962, 966 (9th Cir. 1998).

 The "substantial evidence" standard requires this court to uphold the IJ's and BIA's findings and decisions if supported by "reasonable, substantial, and probative evidence on the record." *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992) (internal quotation marks omitted). To prevail, Petitioner must show that the evidence not only supports, but compels the conclusion that these findings and decisions are erroneous. *See Singh,* 134 F.3d at 966. "This strict standard bars a reviewing court from independently weighing the evidence and holding that petitioner is eligible for asylum, except in cases where compelling evidence is shown." *Id.* (quoting *Kotasz v. INS,* 31 F.3d 847, 851 (9th Cir.1994)) (internal quotation marks omitted). Thus, Petitioner cannot prevail unless she demonstrates that any reasonable factfinder would have to conclude that she is eligible for relief from deportation. *See Fisher v. INS,* 79 F.3d 955, 961 (9th Cir.1996).

### B. Asylum Law

Petitioner originally applied for relief from deportation proceedings in the form of both asylum and withholding of deportation. However, on appeal she does not challenge the decision to deny withholding of deportation. Therefore, discussion of Petitioner's eligibility for relief from deportation proceedings will be limited to asylum.

 To establish eligibility for asylum, Petitioner bears the burden of proving that she is a "refugee." *See Sangha,* 103 F.3d at 1487. The definition of "refugee" includes an alien who is unable or unwilling to return to his or her country of origin "because of persecution or a well-founded fear of persecution on account of . . . political opinion." 8 U.S.C. § 1101(a)(42)(A) (1999). Past persecution or a well-founded fear of future persecution is sufficient to demonstrate "refugee" status. *Velarde v. INS,* 140 F.3d 1305, 1309 (9th Cir.1998). Once an applicant demonstrates past persecution, there is a presumption of a well-founded fear of future persecution. *Id.* at 1309 n. 4. The government may rebut this presumption by showing by a preponderance of the evidence that conditions have changed to such an extent in Guatemala, that Petitioner's fear is no longer "well-founded." *See Singh v. Ilchert,* 69 F.3d 375, 379 (9th Cir.1995) [hereinafter cited as *Ilchert* ].

 A well-founded fear of future persecution must be both "subjectively genuine" and "objectively reasonable." *Velarde,* 140 F.3d at 1309. The subjective component may be satisfied by the applicant's testimony. *Id.* at 1310. The objective component requires credible, direct, and specific evidence. *Id.* A well-founded fear may be based on no more than a ten percent chance of actual persecution. *Id.* However, Petitioner's well-founded fear must be that the guerrillas will persecute her because of a protected ground rather than for any other reason. *See Elias–Zacarias,* 502 U.S. at 483, 112 S.Ct. 812.

Acts of violence against the applicant's friends and family may establish a well-founded fear where these acts create a pattern of persecution closely tied to the petitioner. *Arriaga–Barrientos v. INS,* 937 F.2d 411, 414 (9th Cir.1991). When determining whether a fear is "well-founded," a court may consider evidence that a person could safely move elsewhere in their home-country. *Cuadras v. INS,* 910 F.2d 567, 571 n. 2 (9th Cir.1990).

▮ Persecution is defined as "the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive." *Singh,* 134 F.3d at 967 (quoting *Ghaly,* 58 F.3d at 1431) (internal quotation marks omitted). The determination that actions rise to the level of persecution is very fact-dependent, *id.* at 967–68, though threats of violence and death are enough. *See Sangha,* 103 F.3d at 1487. However, persecution must still be "on account of" a protected ground, such as "political opinion." That persecution was "on account of" one or more of the specified grounds may be shown by inference where the inference is one that may clearly be drawn from facts in evidence. *Id.*

▮ Here, Petitioner claims that she was persecuted "on account of" an imputed political opinion. An imputed political opinion is a political opinion that persecutors attribute to their victim. *Vera–Valera v. INS,* 147 F.3d 1036, 1038 (9th Cir.1998). To establish an imputed political opinion, Petitioner must show, through direct or circumstantial evidence, that the guerrillas actually imputed a political opinion to her and persecuted her for that opinion. *See Sangha,* 103 F.3d at 1489–90. Where one party to a conflict insists to the victim that the victim is aligned with the other side, an imputed political opinion may be found. *Vera–Valera,* 147 F.3d at 1039.

## C. Past Persecution

▮ Compelling evidence demonstrates that the BIA incorrectly assessed Petitioner's eligibility for asylum under 8 U.S.C. § 1101(a)(42)(A). The BIA advanced several reasons for its conclusion that Petitioner failed to demonstrate that she had suffered past persecution on account of imputed political opinion. First, the BIA reasoned that Petitioner had not described her abduction and beating with enough specificity. It is unclear what level of specificity the BIA expects. In addition to Petitioner's description of the events leading up to her first contact with her abductor and the general account of the abduction and the beating set forth earlier, Petitioner also described her abductor's clothing, how long it took him to take her to the riverbank, and that he carried a firearm. She also explained that he implicitly threatened her by telling her that he was letting her go "as a warning." Any reasonable factfinder would have to consider this description specific enough.

Next, the BIA found that even if the abduction and the beating "had been fully described, and rose to the level of persecution, the respondent has also failed to demonstrate that the guerrillas' interest in her was on account of her express or imputed political opinion." Petitioner's testimony makes clear, however, that the exclusive reason the guerrillas pursued her was because she was teaching literacy on behalf of the government. When her abductor first approached the school's receptionist and the student, he did not initially ask for Petitioner by name, but instead asked for the name of the teacher. Later, after he had abducted Petitioner, he informed her that by teaching literacy she was undermining the guerrillas' recruitment efforts.

Although Petitioner testified that she refused to "join" the guerrillas because she "already had a position at the school," this response demonstrated to the man that she planned to continue alignment with a cause obviously at odds with the guerrillas' goals. The man responded by telling Petitioner to "decide which one you're going to work with." This unmistakably evidences

his conclusion that Petitioner was aligned with the government as a result of her profession. *See Vera–Valera,* 147 F.3d at 1039 ("Imputed political opinion exists where one party to a conflict insists to the victim that the victim is aligned with the other side."). Absent her affiliation with the government and its push for literacy among Guatemalans, Petitioner likely would not have come to the guerrillas' attention. *Cf. Sangha,* 103 F.3d at 1490 (deciding that it was as likely the persecutor sought forcibly to recruit the applicant for non-political reasons as it was for the persecutor forcibly to recruit the applicant for his political opinion).

Petitioner's "presumed affiliation" with the Guatemalan government—an entity the guerrillas oppose—is the functional equivalent of a conclusion that she holds a political opinion opposite to that of the guerrillas, whether or not she actually holds such an opinion. *See Briones v. INS,* 175 F.3d 727, 729 (9th Cir.1999) ("[D]eath threats by people on one side of a civil war against a person suspected of being on the other side constitute[s] persecution on account of political opinion.") (quoting *Gomez–Saballos v. INS,* 79 F.3d 912, 917 (9th Cir.1996)) (internal quotation marks omitted). This is the crux of the idea covered by the doctrine of "imputed political opinion" in refugee and asylum law. Accordingly, we hold that any reasonable factfinder would have to conclude that Petitioner suffered persecution, at least in part, due to this imputed political opinion. *See Borja v. INS,* 175 F.3d 732, 735–36 (9th Cir.1999) (adopting a "mixed motive" theory of persecution).

According to the BIA, Petitioner's experiences resulted from "attempted recruitment," "displeasure with the respondent's profession," and nothing more than "the general strategy of the Guatemalan guerrillas to create civil disorder." *See Sanchez–Trujillo,* 801 F.2d 1571, 1581 (9th Cir.1986) (similarly describing attack as a "general shakedown of an unknown man," an "isolated incident," and a "random occurrence indicative of the general upheaval in El Salvador"). These descriptions are not borne out by the record in this case. Petitioner plainly suffered this experience specifically because of her affiliation with the government. Furthermore, the guerrillas specifically targeted her—and as a result, her family: they did not harm her simply as a result of any "general strategy . . . to create disorder." Each of the BIA's attempts to nullify the political overtones of Petitioner's experiences overlooks both the fact that she was affiliated with the government and the obvious inference that her continued teaching meant opposition to the guerrillas' goals.

### D. Well–Founded Fear of Future Persecution

██ Once Petitioner demonstrates past persecution, we must presume that she has a well-founded fear of future persecution. *See Velarde,* 140 F.3d at 1309 n. 4. This presumption is fully supported by Petitioner's testimonial evidence. The horrors allegedly suffered by her family since her departure from Guatemala leave no doubt that her fear is both subjectively genuine and objectively reasonable, if her testimony is credible.

██ Petitioner testified that she would not return to Guatemala today "[b]ecause my family has always told me that they are looking for me. I'm being sought out and they killed my father and later they killed my uncle, then the same thing will happen to me." In each instance where the guerrillas approached her relatives—father, brother, and uncle—the guerrillas were heard to inquire as to the individuals' relation with Petitioner, and as to whether they knew of her whereabouts. The INS complains that all of this information is founded upon hearsay, and, at times, hearsay upon hearsay. This may be true. However, because this court does not require corroborative evidence, *Lopez–Reyes v. INS,* 79 F.3d 908, 912 (9th Cir.1996), that Petitioner's testimony may be based upon hearsay is of no effect. This court

recognizes the serious difficulty with which asylum applicants are faced in their attempts to prove persecution, *see Bolanos–Hernandez v. INS*, 767 F.2d 1277, 1285 (9th Cir.1985), and has adjusted the evidentiary requirements accordingly.

The government has failed adequately to demonstrate that Petitioner could relocate safely in Guatemala due to a change in countrywide conditions. *See Ilchert*, 69 F.3d at 379 (9th Cir.1995) (showing of past persecution leads to presumption of well-founded fear of future persecution which in turn leads to burden on government to show change in country-wide conditions). Finally, we are not convinced that the record demonstrates that Petitioner would be adequately protected by government forces should she return to Guatemala. The BIA stated that the government was able to protect Petitioner and her family when contacted about "unwanted guerrilla attention." This assertion ignores the fact that guerrillas murdered Petitioner's uncle after the military stopped protecting him while he worked in the family's fields. The deaths of her father and uncle clearly show that any reasonable factfinder would have to conclude that Petitioner faces at least a ten percent chance of persecution should she return to Guatemala.

## E. Credibility

■ Although we conclude that Petitioner has demonstrated the requisite past persecution and a well-founded fear of future persecution on account of imputed political opinion, we do not automatically require that the BIA grant her asylum. Instead, we remand the case for the BIA to consider the question of Petitioner's credibility. Where the BIA conducts a de novo review of the record from the IJ hearing, we review only the BIA's decision, except to the extent that it expressly adopts the IJ's opinion. *Ghaly*, 58 F.3d at 1430. Here, the BIA stated that "[e]ven were we to assume that the respondent was a credible witness, we find that she has not adequately established her eligibil-

ity for asylum or withholding of deportation." Thereafter, it never discussed the issue of credibility. This is not the type of "express adoption" that allows this court to undertake a meaningful analysis of Petitioner's credibility and its effect on her application for asylum.

■ Once again, we strongly encourage the BIA to discuss or expressly adopt, rather than ignore, the IJ's credibility findings in an asylum case. The BIA's decision in this case post-dated *Briones*, wherein we similarly encouraged the BIA to deal with credibility issues when it first has the opportunity to do so. *See Briones*, 175 F.3d at 729–30 & n. 1. The message bears repeating. The piecemeal direction in which this case is headed is not a meritorious goal, nor an ideal method of resolution.

■ For purposes of expediency, we take this opportunity to suggest to the BIA some language from this circuit's precedent relevant to the question of Petitioner's credibility as it was analyzed and discussed by the IJ. Even under the substantial evidence standard, an adverse credibility finding must be based on "specific cogent reason[s]," which are substantial and "bear a legitimate nexus to the finding." *Lopez–Reyes*, 79 F.3d at 911 (quoting *Nasseri v. Moschorak*, 34 F.3d 723, 726 (9th Cir.1994)) (internal quotation marks omitted). In determining what "valid grounds" exist for an adverse credibility finding, "an applicant's testimony is not per se lacking in credibility simply because it includes details that are not set forth in the asylum application." *Id.* Similarly, "personal conjecture about what guerillas likely would and would not do ... is not a substitute for substantial evidence." *Id.* at 912. Finally, corroboration is not necessarily required to establish an applicant's credibility. *Id.* (specifically discussing corroborating affidavits).

## CONCLUSION

We conclude that any reasonable factfinder would have determined that Petitioner is eligible for asylum, if Petitioner's testimony is credible. Petitioner's testimony demonstrates both a suffering of past persecution and a well-founded fear of future persecution based upon imputed political opinion. However, despite its independent review of the record from the IJ hearing, the BIA failed to meaningfully discuss the IJ's adverse credibility determination. We thus do not order the BIA to grant relief, but instead remand to the BIA to consider the question of Petitioner's credibility.

Petition granted and remanded for further proceedings consistent with this opinion.