Carlos MOLINA–MORALES,
Petitioner,

v.

IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.

No. 98–71410.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 9, 2000

Filed Jan. 19, 2001

Manuel Rios, Seattle, Washington, for the petitioner.

Norah Ascoli Schwarz, Ann Carroll Varnon (briefed), U.S. Department of Justice, Washington, D.C., for the respondent.

Before: B. FLETCHER, CYNTHIA HOLCOMB HALL, and TASHIMA, Circuit Judges.

Opinion by Judge TASHIMA; Dissent by Judge BETTY B. FLETCHER.

TASHIMA, Circuit Judge:

Carlos Molina–Morales ("Molina"), a native and citizen of El Salvador, petitions for review of an order of the Board of Immigration Appeals ("BIA"), affirming an Immigration Judge's ("IJ") decision, denying him both asylum and withholding of deportation. The BIA held that Molina had not established that he was persecuted

on account of any statutorily-protected ground. We have jurisdiction under § 106(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1105a(a)(1), "as it was codified prior to the passage of [the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104–208, 110 Stat. 3009 (Sept. 30, 1996) ('IIRIRA') ]." [1]  *Kalaw v. INS,* 133 F.3d 1147, 1150 (9th Cir.1997). We deny the petition for review.

### Background

Molina is a 31–year–old unmarried male from Metapan, El Salvador. In February 1989, Molina's 18–year–old aunt [2] and her children were living with Molina and his grandmother in Metapan. For extra money, his aunt baby-sat for the family of Carmen Salazar. Salazar, a wealthy livestock trader, was a leader of the local ARENA party, and was running for mayor of Metapan. One night when his aunt came home from babysitting, she told Molina and his grandmother "that Carmen Salazar had forced her to have sex with him. Afterwards, he told her that if she told anyone that he would kill her and the person that she told." The grandmother suggested that they speak with Father Baria, a priest in the Catholic church, but Molina and his aunt went to the police station the next day. The aunt told a detective her story and he said there would be a wait for the court papers.

A week after they went to the police, Molina's aunt "left for school and she didn't come back. We looked for her everywhere, but we couldn't find her." Four men then came to Molina's home and asked if he could accompany them to the station so that the sergeant could ask him questions. At the station, Molina was questioned about his family until his grandmother arrived with Father Baria,

who requested to remain with Molina during the questioning. The police stopped their questioning but retained Molina's travel documents and his voter identification card.

Three or four days later, a man came to the home to tell Molina that there was a young woman's cadaver at the morgue that may be his aunt. Molina felt uneasy because "I had never seen that man before and it seemed strange to me that he was telling me that." As Molina walked toward the morgue:

> a truck stopped by and four men came out of the truck and one of them put a pistol against my head and they put a bag over my head and they threw me on the truck's bed, and they started stepping on my fingers, but [at that point] they weren't asking any questions they were just torturing me. They put their boots on top of my face.

They then started beating Molina, asking "if anybody knew about the claim [of rape] that we made."

Molina left El Salvador, going across the border to Guatemala. His grandmother visited him twice, and told him that Salazar was mayor of Metapan, "and that the men working for Carmen Salazar continue to search for the respondent." His grandmother did not visit again because on the second visit, "someone followed her."

Molina entered the United States without inspection on or about September 1, 1989, at San Ysidro, California. He then went to Canada to seek asylum. From Canada, he spoke with his grandmother who "would cry and tell me that men were still looking for me and that I could never return [to El Salvador]." According to Molina, men go to his grandmother's home "all the time. They keep asking her where

---

**1.** Because the BIA issued its decision in this case on November 4, 1998 and Molina's deportation proceedings began on November 19, 1992, § 106 of the INA applies. *See* IIRIRA § 309(c)(4); *Kalaw v. INS,* 133 F.3d 1147, 1150 (9th Cir.1997) (applying IIRIRA's transitional rules for judicial review to all final

orders of deportation issued by the BIA on or after October 31, 1996, in cases in which the alien was placed in proceedings before April 1, 1997).

**2.** The record does not reflect the name of Molina's aunt.

I am—where do I live." He testified that Salazar's people would kill him if he returned to El Salvador because "they think I would denounce them."

After living in Canada for about three years, Molina returned to the United States without inspection because his asylum application was denied in Canada. Molina purchased forged immigration papers and false identification in the United States, which he used to procure a U.S. passport.[3]

On November 19, 1992, the Immigration and Naturalization Service issued an Order to Show Cause, charging Molina with entering the United States without inspection in violation of INA § 241(a)(1)(B), 8 U.S.C. § 1251(a)(1)(B) (recodified at INA § 237, 8 U.S.C. § 1227). In 1997, the IJ denied Molina's application for asylum and withholding of deportation, and ordered him deported to El Salvador. The IJ found that Molina was not credible, and that, even if he were, he failed to show that he was persecuted "on account of" political opinion, or any other ground protected under the INA.

Molina appealed to the BIA, which dismissed his appeal in a 2–1 decision. The BIA did not find it necessary to make a credibility determination, because it found that even if Molina's testimony were credible, he failed to meet his burden of proving eligibility for asylum. The BIA noted that Molina "provided no evidence that he opposed the ARENA party or that he was in any way involved with a political party or in political activities in El Salvador." The BIA also asserted that Molina's "attackers did not mention the ARENA party, or anything else of a political nature during the attack." The BIA concluded that Molina's "attackers were [not] in any way motivated by the respondent's political opinion or an opinion they imputed to him.... Rather, the evidence suggests that he fears harm because of a personal matter between him and Carmen Salazar."

The BIA found that Molina failed to establish either past persecution or a well-founded fear of future persecution "on account of" any of the statutory grounds, and thus did not qualify for either asylum or withholding of deportation. Molina filed a timely petition for review.

### Standard of Review

We review de novo determinations by the BIA of purely legal questions concerning requirements of the INA. *See Vang v. INS,* 146 F.3d 1114, 1116 (9th Cir.1998). We examine the BIA's factual findings under the substantial evidence standard. *See Marcu v. INS,* 147 F.3d 1078, 1082 (9th Cir.1998) ("Our task is to determine whether there is substantial evidence to support the BIA's finding, not to substitute an analysis of which side in the factual dispute we find more persuasive."), *cert denied,* 526 U.S. 1087, 119 S.Ct. 1496, 143 L.Ed.2d 650 (1999). We must uphold findings by the BIA "unless the evidence compels a contrary conclusion." *Prasad v. INS,* 101 F.3d 614, 617 (9th Cir.1996) (citing *INS v. Elias–Zacarias,* 502 U.S. 478, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992)). We review the BIA's decision, rather than the IJ's decision, because "the BIA conduct[ed] a de novo review of the record and ma[de] an independent determination about whether relief is appropriate." *De Leon–Barrios v. INS,* 116 F.3d 391, 393 (9th Cir.1997); *see also Ghaly v. INS,* 58 F.3d 1425, 1430 (9th Cir.1995) (stating that we can only review the BIA's decision when it conducts a de novo review, "except to the extent that the IJ's opinion is expressly adopted by the Board").

### Analysis

The Attorney General may, in her discretion, grant asylum to an applicant determined to be a refugee, within the meaning of INA § 101(a)(42)(A), 8 U.S.C.

---

**3.** On November 27, 1996, in the United States District Court for the Western District of Washington, Molina was convicted of making a false statement in an application for a passport, in violation of 18 U.S.C. § 1542.

§ 1101(a)(42)(A). An alien establishes refugee status if he is unable or unwilling to return to his country of nationality or residence either because (1) he was persecuted in the past, or (2) he has a well-founded fear of future persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion." INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A); *see INS v. Cardoza–Fonseca,* 480 U.S. 421, 423, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987); *Korablina v. INS,* 158 F.3d 1038, 1043 (9th Cir.1998). In this case, Molina argues that he is eligible for asylum because he was persecuted on account of an imputed political opinion.

■ The Attorney General must withhold deportation of any asylum applicant who establishes a "clear probability of persecution," which is a stricter standard than the "well-founded fear" standard for asylum. *INS v. Stevic,* 467 U.S. 407, 430, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). An alien who fails to establish eligibility for asylum "necessarily fails to establish eligibility for withholding of deportation." *Singh–Kaur v. INS,* 183 F.3d 1147, 1149 (9th Cir.1999). The applicant has the burden of proving his eligibility with "credible, direct, and specific evidence." *Prasad v. INS,* 47 F.3d 336, 338 (9th Cir.1995) (quoting *Shirazi–Parsa v. INS,* 14 F.3d 1424, 1427 (9th Cir.1994), *overruled on other grounds by Fisher v. INS,* 79 F.3d 955 (9th Cir.1996) (en banc)).

In *Sangha v. INS,* 103 F.3d 1482 (9th Cir.1997), we held that there are three ways that an applicant can establish a "political opinion" claim. *See id.* at 1488–90. An applicant can show: (1) "affirmative political beliefs;" (2) "political neutrality in an environment in which political neutrality is fraught with hazard, from governmental or uncontrolled anti-governmental forces;" or (3) "an imputed political opinion." *Id.* at 1488–89. The BIA concluded that Molina's "attackers were [not] in any way motivated by the respondent's political opinion or an opinion they imputed to him."

■ There is no evidence in the record, nor does Molina assert, that he was persecuted on account of his affirmative political beliefs. Rather, Molina argues that his report of the rape was construed by Salazar and his supporters as "an act against the ARENA party," and that he was therefore persecuted on account of an imputed political opinion. We agree with the BIA, however, that Molina was not persecuted on account of any political opinion, actual or imputed.

"An imputed political opinion is a political opinion attributed to the applicant by his persecutors." *Sangha,* 103 F.3d at 1489. Under this analysis, "the focus of inquiry turns away from the views of the victim to the views of the persecutor," and the court examines "the political views the persecutor rightly or in error attributes to his victims." *Id.* In order to establish an imputed political opinion, "the applicant must show that his persecutors actually imputed a political opinion to him." *Id.*

Molina has not presented any evidence that supports, much less compels, a conclusion that his persecutors attributed a political opinion to him. Rather, as the BIA stated, "the evidence suggests that he fears harm because of a personal matter between him and Carmen Salazar." There is no evidence that Molina's attackers thought that he was aligned with any opposition to the ARENA party. *See, e.g., Cordon–Garcia v. INS,* 204 F.3d 985, 992 (9th Cir.2000) ("Petitioner's 'presumed affiliation' with the Guatemalan government—an entity the guerrillas oppose—is the functional equivalent of a conclusion that she holds a political opinion opposite to that of the guerrillas, whether or not she actually holds such an opinion."); *Sangha,* 103 F.3d at 1489 (noting that an imputed political opinion may be found where one party to a conflict insists to the victim that the victim is aligned with the other side, citing, inter alia, *Singh v. Ilchert,* 63 F.3d 1501, 1509 (9th Cir.1995)). Molina does not assert that he ever expressed views that might have been construed as

**1052**

"political opposition to [ARENA]'s goals." *Vera–Valera v. INS,* 147 F.3d 1036, 1039 (9th Cir.1998). Nor is Molina "a member of a large, politically active family many of whom have already been persecuted for their political beliefs." *Sangha,* 103 F.3d at 1489 (citing *Ramirez Rivas v. INS,* 899 F.2d 864, 865–66 (9th Cir.1990)).

This case is unlike *Navas v. INS,* 217 F.3d 646 (9th Cir.2000), in which the only reason for the murder of the petitioner's aunt was "her murdered husband's political activities and her relationship to him." *Id.* at 660–61. In *Navas,* the "logical inference to be drawn from the circumstances" was that the aunt was murdered because her persecutors "presumed sympathy for the [opposing] position on her part." *Id.* at 661. By contrast, the evidence before us indicates that the disappearance of Molina's aunt was due solely to her report of the rape by Salazar. There is no evidence that Salazar's supporters presumed sympathy on her part or Molina's part for an opposing political view. The mere fact that Salazar was a politician does not compel a conclusion that Molina was persecuted on account of any political opinion his persecutors imputed to him. Salazar's part-time profession as a politician is merely incidental. Even if Salazar had a personal vendetta against Molina, "[p]urely personal retribution is, of course, not persecution on account of political opinion." *Grava v. INS,* 205 F.3d 1177, 1181 n. 3 (9th Cir.2000). We therefore hold that Molina has failed to establish his eligibility for asylum because he has not shown that he was persecuted on account of imputed political opinion.

Because Molina has not met the lesser burden of establishing his eligibility for asylum, he necessarily has failed to meet the more stringent "clear probability" burden required for withholding of deportation. *Singh–Kaur,* 183 F.3d at 1149.

The petition for review is **DENIED.**

BETTY B. FLETCHER, Circuit Judge, dissenting:

I respectfully dissent. While I acknowledge that this is a close case, I believe that Molina–Morales has alleged facts that are sufficiently compelling to support a claim of persecution on account of imputed political opinion and to require a remand back to the BIA for a credibility determination.

As an initial matter, not mentioned in the majority's recital of the facts is the fact that after being severely beaten, Molina–Morales was also thrown unconscious into a river and presumably left for dead by his armed attackers. It was only after these attackers had departed that a nearby farmer felt it was safe enough to come over, "saw that [Molina–Morales] was still breathing," and then rescued him. The only reasonable inference to be drawn from this account is that the attack by Salazar's henchmen constituted nothing short of attempted murder.

Most important, I find incredible the majority's (and the BIA majority's) characterization of these attacks as "[not] in any way motivated by [Molina–Morales]'s political opinion or an opinion [his attackers] imputed to him." To be accused of rape clearly imperiled Salazar's impending mayoral candidacy, as well as his status as local ARENA leader. Most likely, some combination of both personal and political motivations played a role in Salazar's actions in the aftermath of the alleged rape. As we stated in *Navas v. INS,* 217 F.3d 646, 658 (9th Cir.2000), "this court has made clear [that] the statute covers persecution on account of political opinion even where the persecutor acts out of mixed motives. Put another way, the protected ground need only constitute a motive for the persecution in question; it need not be the sole motive." See also *Borja v. INS,* 175 F.3d 732, 734 (9th Cir.1999) (en banc) ("the plain meaning of the phrase 'persecution on account of the victim's political opinion,' does not mean persecution solely on account of the victim's political opinion") (internal quotations omitted). More-

over, the fact that Salazar was able to enlist the services of the police leads me to conclude that the political component outweighed any personal motivations in the persecution that Molina–Morales underwent.

Indeed, the majority's conclusion can only be believed if one turns a blind eye to the recent political and socioeconomic history of El Salvador. In 1989, when these incidents took place, El Salvador was engaged in a lengthy, devastating and highly polarizing civil war. In such a divided society, it would be unreasonable to presume that the rape accusation against Salazar would not also be construed as an overtly political act, posing a direct threat to the established political order. Simply put, parties to ordinary, apolitical "personal vendettas" normally do not and cannot enlist the organs of the state to carry out their aims. Thus, to characterize Salazar's political status as local ARENA leader (and now mayor) as being "merely incidental" to Molina–Morales's persecution completely misreads the nature of El Salvadoran society at the time of these events, and unreasonably downplays the likelihood that Salazar and his ARENA supporters imputed inimical political views to Molina–Morales.

This case is therefore much closer to *Navas*, in which we held that an El Salvadoran refugee—whose aunt and uncle had been murdered by the Salvadoran military, whose mother had been beaten and threatened with death, and whose own life had been threatened—qualified for withholding of deportation (and not just for asylum) based on imputed political opinion. To be sure, Navas's aunt had been married to a member of the leftist guerilla group Frente Farabundo Marti para la Liberacion Nacional ("FMLN"), and Navas himself was known to have distributed political materials. *Navas*, 217 F.3d at 660–61. Critically, however, like this case, the outcome in *Navas* also turned on the claim that the soldiers were motivated not by imputed political opinion, but by a personal vendetta to eliminate a witness to their crimes. The *Navas* court flatly rejected

this argument, stating that "the BIA found that the soldiers' actions were motivated solely by the desire to avoid prosecution. That conclusion is patently erroneous, as any reasonable factfinder would be compelled to conclude." *Id.* at 661; see also *Yazitchian v. INS*, 207 F.3d 1164 (9th Cir.2000) (rejecting the BIA's conclusion that the persecution suffered by Armenian petitioners accused of Dashnak party affiliation was personal, and holding that extortion demanded by the government arose in part because of imputed political opinion); *Grava v. INS*, 205 F.3d 1177, 1181 & n. 3 (9th Cir.2000) (holding that "official retaliation against those who expose and prosecute governmental corruption may ... amount to persecution on account of political opinion," and noting that while "[p]urely personal retribution" is not cognizable for asylum purposes, "many persecutors have mixed motives"); *Vera–Valera v. INS*, 147 F.3d 1036 (9th Cir.1998) (finding imputed political opinion because Peruvian guerrillas viewed a cooperative's president's support for a building project to be against their political agenda, even though he supported the project for business, rather than political, reasons). Notably, the acts of persecution in *Navas* also took place in June 1992—after the signing of the peace accord between the ARENA-dominated El Salvadoran government and the FMLN. By contrast, the persecution suffered by Molina–Morales took place while the civil war was still raging, and when political and social polarization was presumably much higher. Cf. *Cordon–Garcia v. INS*, 204 F.3d 985, 992 ("Petitioner's 'presumed affiliation' with the Guatemalan government—an entity the guerrillas oppose—is the functional equivalent of a conclusion that she holds a political opinion opposite to that of the guerrillas, whether or not she holds such an opinion.") (citing *Briones v. INS*, 175 F.3d 727, 729 (9th Cir.1999) ("[D]eath threats by people on one side of a civil war against a person suspected of being on the other side constitute[s] persecution on account of political opinion.")).

I respectfully dissent because Molina–Morales's treatment in this case was at least in part on account of imputed political opinion.