**Satnam SINGH–KAUR, aka Hari Singh, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 98–70864.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 16, 1999.

Decided July 21, 1999.

Alan M. Kaufman, San Francisco, California, for petitioner.

Kurt Larson and John C. Cunningham, United States Department of Justice, Washington, DC, for respondent.

Before: T.G. NELSON, HAWKINS, and GRABER, Circuit Judges.

Opinion by Judge GRABER; Dissent by Judge HAWKINS.

GRABER, Circuit Judge:

In this immigration case, we are called on to decide whether the adverse credibility findings by the Immigration Judge (IJ) and the Board of Immigration Appeals (BIA) are supported by substantial evidence in the record. We hold that they are and, accordingly, deny the petition.

## PROCEDURES BELOW

Petitioner entered the United States without inspection on May 1, 1995. The United States Immigration and Naturalization Service (INS) later charged Petitioner with being deportable under former section 241(a)(1)(B) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1251(a)(1)(B) (1994) (renumbered § 1227(a)(1)(B)). He conceded deportability but applied for asylum, withholding of deportation, and voluntary departure.

After a hearing, the IJ approved Petitioner's application for voluntary departure, a decision from which no appeal has been taken. However, she denied Petitioner's application for asylum and for withholding of deportation on the ground that Petitioner had not presented credible evidence in support of his claims. The BIA affirmed the IJ's order. Petitioner timely sought review of the BIA's final order, arguing that its adverse credibility finding is not supported by substantial evidence.

## BURDEN OF PROOF

Under section 208(a) of the INA, 8 U.S.C. § 1158(a), the Attorney General has discretion to grant asylum to aliens who qualify as "refugees" under the INA. *See INS v. Elias–Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). A "refugee" is a person who is unwilling to return to the home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42).

An alien bears the burden of establishing eligibility for asylum. *See Mejia–Paiz v. INS*, 111 F.3d 720, 723 (9th Cir.1997). An alien must show by credible, direct, and specific evidence an objectively reasonable basis for the claimed fear of persecution. *See Prasad v. INS*, 47 F.3d 336, 338 (9th Cir.1995).

The Attorney General must grant withholding of deportation when an alien demonstrates a "clear probability" that, if the alien returns to the home country, the alien's "life or freedom would be threatened" on account of race, religion, nationality, membership in a particular social group, or political opinion. *INS v. Stevic*, 467 U.S. 407, 429–30, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). As with asylum, an alien bears the burden of establishing eligibility for withholding of deportation. *See Rebollo–Jovel v. INS*, 794 F.2d 441, 448 (9th Cir.1986). The burden of proof for withholding of deportation is higher than the burden of proof for asylum. *See Prasad*, 47 F.3d at 340. Therefore, if an alien fails to establish eligibility for asylum, then the alien necessarily fails to establish eligibility for withholding of deportation. *See id.*

## STANDARD OF REVIEW

We review credibility findings of an IJ and the BIA under a "substantial evidence" standard. *See Ramos–Vasquez v. INS*, 57 F.3d 857, 861 (9th Cir.1995). That standard is "extremely deferential." *Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir.1995). The court must uphold the BIA's findings unless the evidence pre-

sented would *compel* a reasonable finder of fact to reach a contrary result, *see de Leon–Barrios v. INS*, 116 F.3d 391, 393 (9th Cir.1997); however, minor inconsistencies in the record are not an adequate basis for an adverse credibility finding, *see Mejia–Paiz*, 111 F.3d at 726. " '[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.' " *Leon–Hernandez v. INS*, 926 F.2d 902, 904 (9th Cir.1991) (quoting *American Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 523, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981)).

▮ When the BIA adopts an IJ's findings and reasoning, we review the IJ's opinion as if it were the opinion of the BIA. *See Alaelua v. INS*, 45 F.3d 1379, 1381–82 (9th Cir.1995). Here, the BIA found that Petitioner's "testimony was not credible, based upon the reasons articulated in the Immigration Judge's decision." In addition to adopting her credibility findings, the BIA also adopted the IJ's reasoning. Accordingly, we apply the standard of review to the IJ's opinion.

## PETITIONER'S TESTIMONY

At his deportation hearing, Petitioner testified to the following facts. Petitioner is a native and citizen of India, having been born on January 4, 1960, in the village of Bhan Mazara in the Punjab. He testified that his name is "Hari Singh" and that "Satnam" is not his true first name.

On January 17, 1993, Petitioner was elected sarpanche (leader of the village council) of his village. As sarpanche, he had organizational, administrative, and economic responsibilities. A village council of seven members, whom Petitioner appointed, assisted him with these responsibilities.

Petitioner testified that he came to the United States because the Indian police had arrested him twice and had mistreated him during both arrests. Petitioner stated that his first arrest was related to a police attack on a family's house in his village. That attack left one woman dead. The woman killed was the sister-in-law of Gurdial Singh, a member of the village council. The police accused Gurdial Singh's sister-in-law of harboring militants and holding political meetings in her home.

On July 4, 1993, Gurdial Singh was arrested by the police and taken to the police station. The police tortured Gurdial Singh so badly that he died two days after they released him. After Gurdial Singh's death, about 500 people protested at the police station, demanding that the officers responsible for Gurdial Singh's death be punished. Petitioner testified that he and other community leaders organized that demonstration.

Petitioner supplied the IJ with a newspaper clipping that recounted the events surrounding the demonstration. The newspaper article contained a photograph that Petitioner said shows him at the demonstration.

Petitioner testified that, despite the protest, the police did not immediately punish the officers who were involved in Gurdial Singh's death. However, the superintendent of police from Jalandhar later came to Petitioner's village to investigate the incident. Petitioner testified that the superintendent told him that justice would be done and asked Petitioner for the names of the officers involved in Gurdial Singh's death. Petitioner first testified that *he* gave the superintendent the names of those involved. Petitioner then testified that *the superintendent* gave Petitioner the names of the officers involved. After further questioning by the IJ, Petitioner testified that *Gurdial Singh* had given him the names before he died and that Petitioner then gave the names to the superintendent. Apparently, two officers eventually were suspended for their participation in the incident.

Petitioner testified further that, because he had given information to the superintendent of police regarding the identity of the officers who were responsible for Gurdial Singh's death, the local police arrested him on July 22, 1993. The police detained

him for 18 days. During that time, Petitioner stated that the police beat him, hung him upside down by the ankles, pulled off one of his fingernails, and threatened to kill him. Although Petitioner was not affiliated with any political party, the police accused him of sheltering terrorists and speaking out against the police. Petitioner stated that, after his release, he spent about a month in a hospital.

The police arrested Petitioner a second time on October 12, 1993. Petitioner testified that, on that occasion, the police held him for about two months. During that time, Petitioner testified, the police beat him and hit him with a rod above his left knee, leaving a deep scar. Petitioner testified that the police told him that they arrested him the second time because he spoke out against the police and was harboring terrorists.

After Petitioner was released, he returned home, where he treated his injuries. He remained at home until February 22, 1995, when he left for Bombay. Petitioner stayed in Bombay for about a month before leaving for the United States. Although Petitioner came to the United States on May 1, 1995, he left his wife and two children in his home village in India. Petitioner testified that, since leaving India, he has had monthly or bi-monthly contact with his wife and that she indicates that the police are still asking about him.

### THE IMMIGRATION JUDGE'S ASSESSMENT OF CREDIBILITY

 The IJ's denial of relief from deportation was predicated on her finding that Petitioner had not presented credible evidence. In making her adverse credibility finding, the IJ analyzed four factors, which we consider in turn.

### A. *Demeanor*

 The IJ found that Petitioner's demeanor while testifying tended to show that he was not truthful:

With regard to [Petitioner's] demeanor, it should be noted that[,] although [he] appeared comfortable on direct examination with regard to questions for which he was prepared[,] both on cross examination and upon questioning by the Court when [Petitioner] was faced with difficult or challenging questions he began to literally jump around in his seat and to squirm rather uncomfortably while testifying.

We give "special deference" to a credibility determination that is based on demeanor. *See Paredes–Urrestarazu v. INS,* 36 F.3d 801, 818–19 (9th Cir.1994).

Certainly most witnesses are uncomfortable and nervous when being cross-examined and, perhaps, when being questioned by a judge. Nonetheless, we find no reason to discount the IJ's reliance on Petitioner's demeanor here. As a judge, she has observed many people in Petitioner's position, and we defer to her ability to differentiate between the usual level of anxiety and Petitioner's behavior, for example, "literally jump[ing] around in his seat."

### B. *Consistency of Testimony*

The IJ next found that Petitioner's testimony was internally inconsistent. For example, the IJ noted, he gave different versions of how the names of the police officers came to the attention of the superintendent of police:

[Petitioner] initially testified that he gave [the superintendent] the name of Ajit Singh, who was the stationhouse officer in the village. Later, however, [Petitioner] indicated that it was the superintendent police detective who gave [Petitioner] the names of those who had been responsible. When he was challenged as to the inconsistency of this statement, he then indicated that Mr. Gurdial Singh had given [Petitioner] the names of those who were responsible during the two days that he was in the hospital before he died and that [Peti-

tioner] then gave those names to the superintendent detective.

The record reflects this inconsistency on which the IJ relied.

The IJ also relied on a physical inconsistency. After testifying that the police had pulled a nail off one of his fingers,

[Petitioner] showed the Court a finger on which the nail appeared to be severely deformed. It should be noted that[,] although [Petitioner] did not show the Court the rest of his hand at that time, later the Court did take note that [Petitioner's] thumb on that hand is also severely deformed or split, as if [Petitioner] has two thumbs on that hand.

Petitioner has not challenged the accuracy of the IJ's observation in this regard. This discrepancy is significant because of the emphasis that Petitioner had placed, in his testimony, on the actions of the police with respect to *one* finger only: "They had, they had a kind of pliers and they said that they were going to clip my fingers off with those pliers and they, they removed *one* of my, they removed the skin and *one* nail in *one* finger on my right hand." (Emphasis added.)

The IJ further noted inconsistency between Petitioner's written application for relief and his oral testimony:

[T]he declaration states that [Petitioner] was arrested by the police at least on the first occasion because he was responsible for a newspaper article having been written about the incident [involving Gurdial Singh's death]. Nevertheless, in his testimony, [Petitioner] indicated very clearly that the reason for his arrest was because he was responsible for the suspension of the stationhouse officer, Ajit Singh.

Again, the record reflects the accuracy of the IJ's observation.

Taken together, the inconsistencies to which the IJ points are sufficiently material to permit her to question Petitioner's credibility. The inconsistencies directly concern the reason why the police arrested Petitioner and the nature of the torture that he allegedly suffered.

C. *Plausibility of Petitioner's Testimony*

The IJ found Petitioner's testimony to be implausible in four major respects. First, she found it implausible that Petitioner would have been arrested for fulfilling his duties as sarpanche. Her view is supported by the record. In reply to the IJ's request for an advisory opinion on Petitioner's asylum application, the Department of State reported: "While it is not impossible that the police would arrest the head of a village panchayat, such treatment would be unusual. The authorities generally accord such officials a measure of immunity." Letter from United States Department of State, Bureau of Democracy, Human Rights and Labor, to Office of the Immigration Judge, p. 1 (Mar. 1, 1996). The State Department further reported that, because arrests were occurring with decreasing frequency, it would be "highly unusual" for Petitioner's second arrest to have taken place as he described it. *Id.* at 2.

Second, the IJ found it unlikely that the police would suspect Petitioner of assisting terrorists, when he had absolutely no political affiliations himself and his wife did not have a Sikh name. The record contains those underlying facts.

Third, the IJ found it implausible that the superintendent, "who apparently had enough power to suspend [police officer] Ajit Singh could not then protect the person who provided the information regarding that suspension or that he would refuse to see [Petitioner] with regard to following up on events related to that suspension."

Fourth, the IJ doubted that Petitioner in fact is Hari Singh:

[Petitioner] use[d] one name and then suddenly, part way through his case, switche[d] to another name, a name which happens to appear in newspaper articles with regard to the incidents of which he testifies....

. . .

... It bothers the Court as indicated previously that [Petitioner] used another name through the bond procedures and

that [he] did not initially claim to be Hari Singh....

... [Petitioner's] use of another name throughout the initial portions of these proceedings leaves the Court wondering whether [he] may have simply adopted a story which he knew that he could corroborate through a newspaper article.

The change of name to which the IJ alluded is borne out by the record. For example, on May 12, 1995, Petitioner signed his name on the INS Order to Show Cause as "Satnam Singh." He requested a prompt hearing as "Satnam Singh" and again signed his name in that manner. Only on later documents did he begin to sign his name as "Hari Singh." The record also shows that the forensic laboratory of the INS was unable to determine whether documents from India in the name of Hari Singh, which Petitioner presented at the hearing, are genuine.

The record supports an inference that Petitioner knew that his identity would be an issue at the hearing. That is so, most obviously, because he signed his name using two different first names on various INS documents that would be part of the administrative record in the case. Additionally, the identification documents that Petitioner introduced had been subjected to analysis by the forensic laboratory of the INS, whose report (albeit an inconclusive one) was introduced at the hearing.

In the circumstances, the IJ reasonably resolved her doubt against Petitioner, who bore the burden of proof.

## D. *Level of Specificity of Petitioner's Testimony*

Finally, the IJ was suspicious of Petitioner's testimony because of its lack of specificity concerning matters outside the ambit of the newspaper article:

[V]irtually all of the details given in [Petitioner's] testimony also appeared in the newspaper article which [he] presented to corroborate his testimony. Normally, the Court would see this as a positive factor in support of [Petitioner's] claim. On the other hand, [Peti-

tioner] did not give many details which were not contained in the article.... The record does not contradict the IJ's conclusion that the article provided most of the details of the central events that Petitioner recounted in his testimony.

## CONCLUSION

The record provides substantial evidence to support the adverse credibility determinations of the IJ and the BIA. A reasonable finder of fact would not be compelled to conclude that Petitioner's claim is credible.

## PETITION DENIED.

MICHAEL DALY HAWKINS, Circuit Judge, dissenting:

This case rises or falls on whether Petitioner is who he says he is. If he is, then he was a leader in his native village in India, arrested but never prosecuted, and unquestionably tortured by the Indian police on account of his protest against police treatment of Sikhs and is quite likely to receive the same treatment if returned to India. If he is not, then no other matter of credibility has any importance and his petition should fail. While the majority minimizes the significance of Petitioner's identity to the Immigration Judge ("IJ"), the IJ's adverse credibility determination is based almost entirely on Petitioner's identity. On at least three separate occasions, the IJ's opinion underscores the importance of Petitioner's identity. The IJ begins her analysis by stating: "The big question, of course, because of respondent's use of another name throughout the initial proceedings is whether respondent is truly Hari Singh." Yet, despite this emphasis, the IJ never asked Petitioner the reason for his "name change," gave any indication that his true identity was significant, or that she questioned whether Petitioner was who he claimed to be.

*Campos–Sanchez v. INS,* 164 F.3d 448, 450 (9th Cir.1999), reiterated our longstanding recognition that the Fifth Amendment guarantees due process in deportation proceedings, *see also Ramirez v. INS,*

550 F.2d 560, 563 (9th Cir.1977), and requires that an asylum seeker receive a full and fair hearing. *See, e.g., Campos–Sanchez,* 164 F.3d at 450; *Castillo–Villagra v. INS,* 972 F.2d 1017, 1018 (9th Cir.1992); *Barraza Rivera v. INS,* 913 F.2d 1443, 1447 (9th Cir.1990). *Campos–Sanchez* held that where the IJ previously found the petitioner credible, "the BIA must provide petitioner with a reasonable opportunity to offer an explanation of any perceived inconsistencies that form the basis of a denial of asylum." 164 F.3d at 450.

Here, we have the opportunity to apply these fundamental due process principles to an even more critical stage in the asylum process—the immigration hearing itself. As in *Campos–Sanchez,* the record reveals that at no point in the proceeding did the IJ advise Petitioner that his identity was in issue. Despite engaging in a number of lengthy colloquies with Petitioner, the IJ never asked him, directly or indirectly, about his use of a different name at earlier stages in the immigration proceedings. Moreover, although Petitioner knew that as a general matter his credibility would be at issue when he testified before the IJ, he had no indication that his identity would play such a crucial role in the IJ's decision to deny asylum. Under these circumstances, Petitioner is no less deserving of the basic due process principles upon which *Campos–Sanchez* relied—notice and an opportunity to respond.

If Petitioner is who he claims to be, then the other proffered reasons for rejecting his credibility are not supported by substantial evidence. While the majority places great weight on the IJ's comment regarding Petitioner's demeanor, the IJ's discussion of Petitioner's demeanor constituted but a single sentence. There is no evidence that Petitioner was evasive or untruthful, *see Turcios v. INS,* 821 F.2d 1396, 1400 (9th Cir.1987), only that he appeared uncomfortable with questions posed on cross-examination and by the IJ. Given that Petitioner's asylum claim is based on arrest, abuse and torture by government officials, and that he does not understand English and was testifying through an interpreter, his reaction seems entirely understandable and does not provide a proper basis upon which to reject his credibility. *Cf. Vilorio–Lopez v. INS,* 852 F.2d 1137, 1141–42 (9th Cir.1988); *Turcios,* 821 F.2d at 1400.

Moreover, the internal inconsistencies outlined by the majority do not go to the heart of petitioner's asylum claim. *See Berroteran–Melendez v. INS,* 955 F.2d 1251, 1256–57 (9th Cir.1992). His description of the removal of his fingernail, instead of explicitly referring to his deformed thumb, is simply not a basis for rejecting his testimony. Given that Petitioner was describing a traumatic event through an interpreter, his description of his injury, however grammatically incorrect, is trivial. *See Damaize–Job v. INS,* 787 F.2d 1332, 1337–38 (9th Cir.1986). Likewise, any significance attached to how the names of the police officers came to the attention of the police superintendent is misplaced, because the record reflects that the exchange between Petitioner and the IJ on this matter was frustrated by communication problems.

Similarly, the alleged inconsistency between Petitioner's written application and oral testimony is in fact not an inconsistency at all. The two explanations for his first arrest—that he was responsible for a newspaper article written about Gurdial's death and that he was responsible for the suspension of a police officer, Ajit Singh ("Ajit")—are not only not mutually exclusive, they easily co-exist. Since Petitioner was responsible for the protest that the article described which was followed by Ajit's suspension, it is entirely possible, indeed logical, that Petitioner may be responsible for an article about the Gurdial death and for the suspension of Ajit. Such additional information brought out during Petitioner's testimony does not create an inconsistency and is not a legitimate reason to reject his credibility. *See Aguilera–Cota v. INS,* 914 F.2d 1375, 1381–82 (9th Cir.1990).

Petitioner's testimony was also dismissed because the IJ found the events

described implausible. However, we have consistently stated that personal conjecture about what persecutors would or would not have done is not a substitute for substantial evidence. *See, e.g., Lopez–Reyes v. INS,* 79 F.3d 908, 912 (9th Cir. 1996); *Del Valle v. INS,* 776 F.2d 1407, 1413 (9th Cir.1985). Finally, the contention that Petitioner's testimony was too closely tied to newspaper articles and therefore not credible places Petitioner between the proverbial rock and a hard place. As the IJ admitted, Petitioner's testimony was "fairly specific and detailed." Moreover, the majority and the IJ overlook that Petitioner's testimony did provide information and details not found in the newspaper articles, including: (1) the names of the seven members who assisted Petitioner in his duties as village leader; (2) the event where Gurdial's sister-in-law was killed; (3) Petitioner's own torture, beating and arrest; and (4) Petitioner's attempt to contact the police superintendent.

Because the sine qua non of the IJ's adverse credibility finding was Petitioner's identity, I would apply the due process principles outlined in *Campos–Sanchez,* 164 F.3d at 450, and remand for a new hearing on Petitioner's identity.