**Maria Teresa Posadas PAGUNSAN, Petitioner,**

v.

**Alberto R. GONZALES, Attorney General, Respondent.**

**No. 04–71429.**

United States Court of Appeals, Ninth Circuit.

Submitted May 4, 2006.[*]

Decided July 11, 2006.

---

[*] This panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R.App. P. 34(a)(2).

David A. Schlesinger, Esq., Andrea Guerrero, Esq., Guerrero & Jacobs, LLP, San Diego, CA, for Petitioner.

District Director, Office of the District Counsel, Department of Homeland Security, San Diego, CA, Ronald E. LeFevre, Chief Counsel, Office of the District Counsel, Department of Homeland Security, San Francisco, CA, Carol Federighi, Esq., M. Jocelyn Lopez Wright, Esq., Jennifer

Paisner, Esq., U.S. Department of Justice, Civil Div./Office of Immigration Lit., Washington, DC, for Respondent.

Before: HAWKINS and PAEZ, Circuit Judges, and WAKE,** District Judge.

## MEMORANDUM ***

Maria Teresa Posadas Pagunsan, a native and citizen of the Philippines, petitions for review of the decision of the Board of Immigration Appeals ("BIA") dismissing her appeal from the immigration judge's ("IJ") denial of her application for asylum and withholding of removal.[1] We have jurisdiction pursuant to 8 U.S.C. § 1252. The immigration judge based the denial of relief on an adverse credibility finding. The BIA affirmed the adverse credibility finding and held, in the alternative, that Pagunsan failed to meet her burden of proof for asylum. *Id.* § 1158. Because we hold that these grounds for denying relief are not supported by substantial evidence, we grant the petition for review and remand.

■ "Where, as here, the BIA adopts the IJ's decision while adding its own reasons, we review both decisions." *Siong v. INS*, 376 F.3d 1030, 1036 (9th Cir.2004) (internal quotation marks omitted). We review adverse credibility determinations for substantial evidence. *Gui v. INS*, 280 F.3d 1217, 1225 (9th Cir.2002). In this case, the immigration judge relies primari-

---

** The Honorable Neil V. Wake, United States District Judge for the District of Arizona, sitting by designation.

*** This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Cir. R. 36–3.

1. The IJ also rejected Pagunsan's claim for relief under the Convention Against Torture ("CAT"). Pagunsan did not appeal the denial of CAT relief to the BIA or to this court.

ly on discrepancies between Pagunsan's 1991 asylum application and her updated 2000 asylum application.[2] Because a fair reading of Pagunsan's 1991 application compels the conclusion that Pagunsan did in fact raise the basis for her fear of the New People's Army ("NPA") in her original 1991 application, substantial evidence does not support an adverse credibility finding on this basis. *See Smolniakova v. Gonzales*, 422 F.3d 1037, 1044–48 (9th Cir. 2005).[3]

We also review for substantial evidence the BIA's finding that Pagunsan failed to demonstrate her eligibility for asylum. *See id.* at 1044. Pagunsan's testimony, taken as credible, definitively establishes that the NPA targeted her, at least in part, for opposing their political cause. *See Tarubac v. INS*, 182 F.3d 1114, 1118–19 & n. 4 (9th Cir.1999). It also establishes that Pagunsan has a sub-

jective fear of future persecution. Moreover, while Pagunsan was never physically harmed, we have consistently held that threats of death by an organization capable of carrying them out are sufficient in and of themselves to constitute evidence of an objectively reasonable fear of future persecution. *See, e.g., Canales–Vargas v. Gonzales*, 441 F.3d 739, 743–44 (9th Cir. 2006); *Lim v. INS*, 224 F.3d 929, 936–37 (9th Cir.2000). Because Pagunsan was threatened on multiple occasions, the most notable involving the brutal murder of a close family friend in an effort to send a "message" to her, and placed on the NPA's death list, we are compelled to conclude that Pagunsan has established a well founded fear of future persecution.

Accordingly, we grant the petition, reverse the adverse credibility determination, and hold that Pagunsan has established a well founded fear of future persecution based on a protected ground

2. The IJ noted several other factors suggesting Pagunsan lacked credibility but concluded that these factors were insufficient to justify an adverse credibility finding, stating explicitly "But aside from *all of that*, of course, *these are all* minor things. I would not make my decision just based upon that. (emphasis added)." We take the IJ at her word that she would not have made an adverse credibility finding based on "all" of the "minor" reasons that she articulated prior to her discussion of the alleged discrepancies between Pagunsan's 1991 and 2000 applications. We therefore do not address these factors. *See Marcos v. Gonzales*, 410 F.3d 1112, 1116 (9th Cir.2005) ("Our review focuses only on the actual reasons relied upon by the IJ."); *id.* at 1118 ("Because the IJ expressed no further concerns, and the only *explicitly articulated* reasons rested on impermissible factors, then we conclude from the IJ's opinion that [the petitioner] was an otherwise credible witness." (internal quotation marks omitted) (alterations in original)).

3. The dissent relies on alleged discrepancies between Pagunsan's 1991 and 2000 applications. The dissent's approach is inconsistent with our case law. Pagunsan filed her 1991 application pro se, whereas she filed her 2000

application with the assistance of counsel. As we explained in *Smolniakova*, an IJ may not base her adverse credibility determination on a finding that facts not inconsistent with the applicant's later, more detailed testimony were omitted from an asylum application, especially when that application was filed pro se. 422 F.3d at 1045. Rather, the IJ is to read asylum applications filled out without assistance of counsel "charitably." *Id.* "[Pagunsan]'s failure to file an application form that was not as complete as might be desired cannot, without more, properly serve as the basis for a finding of a lack of credibility." *Aguilera–Cota v. INS*, 914 F.2d 1375, 1382 (9th Cir.1990); *see Singh v. Ashcroft*, 301 F.3d 1109, 1112 (9th Cir.2002) (explaining the difference between inconsistencies and omissions and holding that the omission of facts from a petitioner's earlier statements cannot be the basis for an adverse credibility finding); *Lopez–Reyes v. INS*, 79 F.3d 908, 911 (9th Cir.1996) ("It is well settled that an applicant's testimony is not per se lacking in credibility simply because it includes details that are not set forth in the asylum application.").

(i.e., political opinion). On remand, the BIA should determine Pagunsan's eligibility for asylum and withholding of removal, accepting her testimony as credible and as establishing a well founded fear of future persecution.

Petitioner's Request to Take Judicial Notice is DENIED.

We GRANT the petition for review and REMAND for further proceedings.

WAKE, District Judge, dissenting.

Pagunsan's final account of politics and persecution, if it must be believed, suffices for a claim of asylum. But a bare reading of her account, which has grown from a sapling to an oak from its first telling to its last, does not compel belief. The Immigration Judge and the Board of Immigration Appeals found Pagunsan not credible for vagueness, improbability, and material differences in her accounts, finding also that her demeanor betrayed her. Those conclusions are within the Board's charge and beyond ours.

## I. Background

Pagunsan grew up on the southern Philippine island of Panay. After receiving her bachelor's degree in chemical engineering, she lived and worked in Manila from 1981 until 1990. While living in Manila, Pagunsan visited her parents' home on Panay about three times a year. In August 1990, Pagunsan received a student visa to come to the United States. Within three months of arriving in Florida, Pagunson abandoned her graduate studies and relocated to California, where she has relatives.

In September 1991, on the eve of expiration of her student visa, Pagunsan submitted her first application for asylum. In 2000, she submitted a new application.

Both applications addressed events up to 1990.

## II. Discussion

### A. The 1991 Application for Asylum

Pagunsan's application stated summarily that she could not return to the Philippines because "[m]y life would be in danger" and "I cannot return to my home country as long as my life is threatened." She attached a seven-paragraph narrative stating:[1]

—"I am fearful that I may be harmed or killed by a group of armed rebels in our province called the New People's Army (NPA)."

— At unexpected times the NPA members "would knock at our house" and ask for food. Her family gave them food because they were afraid they might be harmed.

— Pagunsan's family was well known in her province, her father and uncle having been involved in government. The NPA knew where they lived and that they could give to their movement.

— In 1990, when she was visiting her home province, some armed men "knocked in the middle of the night and demanded to have a talk with me. They told me they expected me to give regular monthly dues for their movement. I refused them because I did not want to get involved in their movement."

— The rebels knew she owned a small farm and had a good job in Manila. "With my income or from my harvest on the farm, the rebels intended to extort support from me. It is my belief that NPA wants monetary and material as well as popular support and they don't care whether they

---

1. Grammatical mistakes in these quotations are in the original.

get these by fair or foul means or by intimidation and threat."

— A few days later the rebels gruesomely murdered a close family friend and sent the friend's son to tell her "that the rebels wanted to give me a message because I was a hard-boiled person. They warned that they were watching and that I should be careful."

— This incident shook up everyone in the village. "I feel that I have already been tortured psychologically and emotionally."

Pagunsan's 1991 account is conclusory on what she believed and sparse on what she was told. Nothing in her original account stated that she communicated to the NPA any political reason for refusing to contribute to them or that they communicated to her any reason beyond the monetary for their extortion. She believed they sought financial support for mixed economic and political reasons and she asserted her own fear. But she described no explicit threat, only a threat implied from actions and for no articulated purpose beyond payment of monies.

**B. The 2000 Application for Asylum**

Nine years later Pagunsan submitted a new application for asylum, which included rich new facts that one would expect not to be overlooked in 1991 if they were true. They are the following:

— Pagunsan was on the NPA's liquidation list.

— It started "when I refused to cooperate ... to overthrow the government of the Philippines and also refused to contribute financially to help their cause...."

— "Instead, as a member of the Barangay, the smallest unit of government in the Philippines, in its campaign to convince my neighbors, friends and relatives not to assist or help the New People's Army to overthrow the government."

— She and her relatives were all members of the Barangay. "My civic duties are to assist the Barangay in its campaign against lawless elements, particularly the Communist Party or New People's Army, to pay taxes for the financial support of the Barangay, not to contribute financially or in kind to the New People's Army. Because of my refusal to cooperate with the New People's Army to cooperate with them, besides, convincing my relatives and neighbors not to support them and also to report their presence in the area whenever they come to patrol, I became a target for liquidation by the New People's Army."

— She "campaigned against the New People's Army" and "convinced my relatives, friends and neighbors to cooperate with the Barangay ... to ferret out any suspected collaborators to the cause of the New People's Army. We do this by reporting to the Barangay the presence of strangers or suspicious persons coming into the area...."

— She recounts that the NPA came to her father's home, but this time they "confronted my father about my activities of speaking against communist ideologies, convincing the people not to cooperate with them." From then on she "kept a low profile, but continued to convince my relatives, friends and neighbors to keep supporting the barangays. That from that time on I seldom stayed at home and when I was informed that I was due for liquidation, I left and with the help of relatives I was able to leave the country."

Thus, between the 1991 and the 2000 tellings, Pagunsan grew from an occasional

visitor living in Manila, known to have the means to pay NPA taxes but refusing to do so, to an activist in the local community leading the fight against the NPA with her relatives, friends, and neighbors and reporting on NPA activities to the government. All of this occurred even though she had lived for the previous nine years in Manila and only visited her home province three times a year.

Just as startling is the difference in threats remembered in 1991 and in 2000. In 1991, she recounted no explicit threats but a powerful implied threat from brutality to another person and without a specific threat purpose communicated. In 2000, she recounted that she had been informed in 1990 that she was on the NPA liquidation list-an astounding fact to leave out when writing up her 1991 *circumstantial* case for why she felt threatened.

No jury would have to believe this transformation or the general truthfulness of the person telling of it.

## C. Hearing Testimony

In her August 21, 2002 hearing testimony, Pagunsan stated that the NPA wanted her to give money and to join their cause. She asked the chief of police for protection, but he could not provide it. Pagunsan also submitted three affidavits dated November 22, 2000, from the barangay chief executive, a municipal mayor, and a chief of police, stating that Pagunsan is on the NPA death list. Only the chief of police stated a basis for such knowledge-he learned it from Pagunsan's father, whose basis for such belief is not given either. The barangay chief executive's and the municipal mayor's identical statements do not confess their sole reliance on Pagunsan's father, but their silence as to basis for knowledge is suspicious in itself and allows an inference that they too were relying on what her father told them and asked them to repeat. Pagunsan's father asked all three witnesses for their affidavits.

The Immigration Judge discounted the three affidavits concerning the NPA death list as having been written as a favor to Pagunsan. This is apparent from Pagunsan's testimony, from the chief of police's disclosure that Pagunsan's father was his source, and from the absence of any stated source of information for the other two affidavits. The Immigration Judge further relied on Pagunsan's lack of credibility for discounting the conclusory affidavits. The trier of fact is not compelled to accept conclusory testimony without a stated or apparent basis for knowledge, not even hearsay from a credible source. *See Xiaoguang Gu v. Gonzales,* 429 F.3d 1209, 1216 (9th Cir.2005) ("We hold that where an asylum applicant's testimony consists of hearsay evidence which is not susceptible to cross-examination, the statements by the out-of-court declarant need not be automatically taken as true and, compared to non-hearsay evidence, may be accorded less weight by the trier of fact."). The Immigration Judge did not err in discounting the affidavits.

## D. The Immigration Judge's and the Board's Grounds for Rejecting Credibility

Adverse credibility findings are reviewed under the substantial evidence standard. *Gui v. INS,* 280 F.3d 1217, 1225 (9th Cir.2002). Deference is given to the immigration judge because she is in the best position to assess the trustworthiness of the applicant's testimony. *Estrada v. INS,* 775 F.2d 1018, 1021 (9th Cir.1985); *see also Mendoza Manimbao v. Ashcroft,* 329 F.3d 655, 661 (9th Cir.2003). "Although the substantial evidence standard is deferential, the [immigration judge] must provide a specific cogent reason for the adverse credibility finding." *Gui,* 280

F.3d at 1225 (citations and internal quotation marks omitted). As long as one of the identified grounds underlying a negative credibility finding is supported by substantial evidence and goes to the heart of the claim of persecution, the court is bound to accept the negative credibility finding. *Li v. Ashcroft*, 378 F.3d 959, 964 (9th Cir. 2004).

### 1. The Preliminary Adverse Findings

The Immigration Judge considered all the evidence, including the 1991 application, and "paid close attention to the demeanor." She found Pagunsan not credible for "many" reasons.

The Immigration Judge first noted a lack of details-"specific dates, times, names of persons"-and corroboration. The trier of fact may find testimony not credible for lack of detail or vagueness. *Singh–Kaur v. INS*, 183 F.3d 1147, 1153 (9th Cir.1999) (upholding the immigration judge's credibility determination based in part on petitioner's failure to articulate details beyond those provided in a newspaper article submitted as corroborating evidence); *Estrada*, 775 F.2d 1018 at 1021 (holding that the immigration judge had substantial evidence for finding a petitioner's testimony incredible when his allegations regarding threats were vague). Pagunsan's applications and testimony were vague and lacking detail. The concrete and plausible detail of a real experience shows differently from mere conclusions and generalities more common in a made-up story. Most of the detail available from a true story was gone from both of Pagunsan's accounts.

The Immigration Judge also noted the implausibility of Pagunsan's story that the rebels supposedly made no demands on Pagunsan's parents, prosperous local property owners, but only on their daughter, who "has the least contact with the island." Intrinsic implausibility is enough to leave a story within the persuasion or not of the trier of fact. *See Singh–Kaur*, 183 F.3d at 1152–53 (upholding the immigration judge's reliance on implausibility as a reason to undermine a petitioner's credibility). This finding against credibility because of implausibility was not error. The Immigration Judge made an express adverse demeanor finding. "We give 'special deference' to a credibility determination that is based on demeanor." *Singh–Kaur*, 183 F.3d at 1151 (quoting *Paredes–Urrestarazu v. INS*, 36 F.3d 801, 818–19 (9th Cir.1994)). The Immigration Judge stated that when Pagunsan's testimony ended and her attorney asked her whether she had anything else to add, Pagunsan began to cry in a manner suggesting "that she had forgotten to cry and she needed to cry." The Immigration Judge found the weeping to be "made up" and "almost offensive to the Court [and] to the Court's integrity." The Immigration Judge stated that she understood and empathized with the fact and the appropriateness of emotions shown by applicants for asylum in recounting their experiences, but that is not what she observed here. The Immigration Judge specifically found that this insincere, forced weeping "calls for a finding of lack of credibility."

The majority discards the Immigration Judge's three previously stated reasons for finding lack of credibility without weighing any of them. After discussing Pagunsan's forced weeping and its difference from spontaneous emotions at asylum hearings, the Immigration Judge added in her oral ruling, "these are minor things" and "I would not make my decision just based on that." The majority says that the Immigration Judge "concluded that these factors were insufficient to justify an adverse credibility finding." The majority takes the Immigration Judge's statement to concede (1) that the three grounds for finding lack of credibility are all "minor things"

and (2) that none alone or together is sufficient to reject Pagunsan's credibility and therefore none carries any weight at all. The first reading is improbable and the second goes against the plain words of the Immigration Judge.

First, it is unlikely that the Immigration Judge meant to retract all her previously articulated substantive reasons for rejecting Pagunsan's credibility when she said, immediately after finding Pagunsan to have forced weeping, which is often spontaneous and natural in such hearings, that "these things" are minor and she would not base her decision "just" upon "that." Read out of context, the plural "these things" could refer to her multiple observations about the single subject of weeping or to all her previously articulated reasons for finding against credibility. But in context, the Immigration Judge was more likely referring only to her immediately preceding observations about displays of emotion and their effect for or against finding sincerity or manipulation.

It is too hostile a reading of the Immigration Judge's acknowledgment that she would not find against Pagunsan just based on demeanor to take it as also retracting the previously stated substantive grounds for disbelief. Care in not putting too much weight on demeanor alone cannot fairly be taken as implicitly abandoning the expressly articulated and otherwise legitimate substantive grounds for disbelief. Because the Immigration Judge's reference to "these things" that are "minor" was only to her observations on demeanor, her statement meant only that she would not find against Pagunsan "just" on demeanor. This reading is consistent with her earlier statement, which the majority does not reconcile, that she had "many" reasons for not believing Pagunsan's testimony.

Second, the Immigration Judge did not state that even the adverse demeanor find-

ing counted for nothing, thus freeing us from having to consider it at all. She considered it together with her substantive findings. Even if the Immigration Judge meant to say that she would not find against Pagunsan "just" based on all three reasons-lack of detail, improbability, and demeanor-she did not say they all counted for nothing in determining credibility.

Therefore, the majority errs in weighing the whole of the adverse credibility finding as the sum of one of its parts.

2. The Heart of the Differences in the Accounts of Threats

Moreover, the one part of the adverse credibility finding that the majority does weigh, the difference in accounts of threats, still supports the finding of lack of credibility, the more so with the Immigration Judge's other findings in the balance. The Immigration Judge stated:

We have the most telling fact in this case that this woman is not telling the truth with her claim and that is her prior asylum application.... Why would she, ten years ago or eleven years ago when she filed her application with the United States, have forgotten the fact that she came to this country because of threats? If that was what caused her to leave the Philippines and come to this country, then would she not have said that originally in 1991 when she requested asylum? So these allegations of threats are of recent vintage, which obviously call for a lack of credibility. The story of a refugee should not change because of the passage of time. Logic calls for a finding that this story would be more recent in the mind of the person or more easily remembered closer to the day when it occurred than later on. So obviously, if the threats were what caused her to come to the United States, she would more than likely have

remembered those back in '91, although she could claim she had forgotten today. That is the reverse. In 1991, no threats were alleged, whereas in 2002, the whole reason why she is here is because of the threats. So some obvious and important inconsistency as such cannot be ignored by the Court.

The Immigration Judge plainly refers here to the credibility-destroying fact that in 1991 Pagunsan recounted no direct threats and constructed only a circumstantial case for why she felt threatened for not paying revolutionary taxes. Yet in 2000 she remembered being told in 1990 that she was on the NPA liquidation list and that she had extensive activities and a leadership role in opposing the NPA in her parents' community. This dramatic difference in accounts goes to the " 'heart of [the] asylum claim.' " *Chebchoub v. INS,* 257 F.3d 1038, 1043 (9th Cir.2001) (quoting *Ceballos–Castillo v. INS,* 904 F.2d 519, 520 (9th Cir.1990)); *accord De Leon–Barrios v. INS,* 116 F.3d 391, 393–94 (9th Cir.1997) ("The discrepancies between de Leon's two applications, however, are not minor. Instead, the discrepancies relate to the basis for his alleged fear of persecution. These discrepancies involved the heart of the asylum claim and support the negative credibility finding.") (citations and internal quotation marks omitted). As in *de Leon–Barrios,* Pagunsan's two applications present different reasons for her alleged fear of persecution.

Minor discrepancies that are not attempts to enhance claims of persecution have no bearing on credibility. *Shah v. INS,* 220 F.3d 1062, 1068 (9th Cir.2000). Such discrepancies in recall, emphasis, and detail are consistent with truthfulness. The discrepancies in Pagunsan's 2000 application are dramatic. Human experience teaches that such critical omissions and later-found improvements can be the mark of fabrication. A story and a witness thus

tainted do not compel belief from all reasonable triers of fact.

The majority nevertheless finds this conclusion unsupported by substantial evidence because Pagunsan's 1991 application "did in fact raise the basis for her fear of the New People's Army." It finds the additional facts in Pagunsan's 2000 application did not contradict her 1991 application but rather demonstrated that she had merely omitted relevant facts from her initial application. The majority holds that truthbetraying "discrepancies" do not include "omissions." To the contrary, our case law recognizes differences in degree among omissions. While "[o]missions from asylum applications are often not a sufficient basis for discrediting later testimony," *Alvarez–Santos v. INS,* 332 F.3d 1245, 1254 (9th Cir.2003), sometimes those omissions are so "pivotal" and "dramatic" that they do in fact demonstrate a lack of credibility:

> It is simply not believable that an applicant for asylum would fail to remember, and thus to include in either of his two asylum applications *or* his principal testimony, a dramatic incident in which he was attacked, stabbed, and fled to the mountains-the very incident that precipitated his flight from Guatemala-only to be reminded of it at the conclusion of his testimony, after taking a break, and, assertedly, because of an itch in his shoulder.

*Id.* (emphasis in original).

As in *Alvarez–Santos,* the omissions in Pagunsan's application are "dramatic" and "pivotal." The basis in Pagunsan's 1991 application was only the fear inherent in not meeting the rebels' demand for money and the threat implied in the warning "that they were watching and that I should be careful" after her family friend was murdered. That is far distant from Pagunsan's nine-years-later account of having

known in 1990 of a death list and of community leadership against the NPA in an area in which Pagunsan spent only a few weeks a year. If we hold the two to be so close as to strip the difference in stories of value for judging the teller's truthfulness, then we are repealing the laws of human experience for the Board alone among triers of fact.

I would deny the petition.