FILED

**NOT FOR PUBLICATION**

JAN 25 2011

UNITED STATES COURT OF APPEALS

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| OLEG VALENTINOCITCH MOROZOV; et al., | No. 06-75343 |
| Petitioners, | Agency Nos. A079-525-750 |
| | A079-525-751 |
| v. | A079-525-752 |
| ERIC H. HOLDER, Jr., Attorney General, | MEMORANDUM[*] |
| Respondent. | |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted December 7, 2010
Pasadena, California

Before: PREGERSON, CLIFTON, and BEA, Circuit Judges.

Oleg Morozov, a native and citizen of Russia, petitions for review of a

decision by the Board of Immigration Appeals affirming the immigration judge's

denial of his applications for asylum and withholding of removal. We deny the

petition.

---

[*] This disposition is not appropriate for publication and is not precedent
except as provided by 9th Cir. R. 36-3.

Morozov filed his asylum application on May 21, 2001, more than one year after entering the country. The INA generally requires that an applicant file for asylum within one year of arriving in the United States. 8 U.S.C. § 1158(a)(2)(B). However, a late filing can be excused if the applicant can show "extraordinary circumstances," such as "[s]erious illness or mental or physical disability, including any effects of persecution or violent harm suffered in the past, during the 1-year period after arrival." 8 C.F.R. §208.4(a)(5)(i). The IJ's extraordinary circumstances determination is reviewed for substantial evidence. *See Ramadan v. Gonzales*, 479 F.3d. 646, 656-58 (9th Cir. 2007).

Morozov contends that the violent attacks inflicted by members of the Russian National Unity left him too traumatized to file for asylum within the statutorily mandated period. However, the record demonstrates that despite his anxiety, Morozov was able to work outside the home and to obtain a driver's license and a visa extension. The record also indicates that Morozov relied upon his wife to report the attack on him to the Russian police, and Morozov did not explain why his wife, whose own application for asylum is derivative of her husband's, could not have assisted him to file for asylum on time. The IJ's conclusion that Morozov failed to present an extraordinary circumstance that would warrant a late application was thus supported by substantial evidence.

2

The IJ denied Morozov's withholding of removal application due to adverse credibility. Credibility determinations are reviewed under the substantial evidence standard. *Kin v. Holder*, 595 F.3d 1050, 1054 (9th Cir. 2010).

The IJ based her adverse credibility finding, in part, on Morozov's hostile demeanor. On cross-examination, Morozov became "loud and defensive" and shook his hand and pointed his finger at the trial attorney in response to questions. The IJ sufficiently explained why she drew a negative inference from this conduct. *See Singh-Kaur v. INS*, 183 F.3d 1147, 1151 (9th Cir. 1999) (noting this court's "special deference" to credibility determinations based on an applicant's demeanor).

The IJ also legitimately questioned Morozov's credibility due to inconsistencies in his testimony regarding the reporting of the August 26, 1998 attack. In his declaration in support of his I-589, Morozov stated that he had registered a complaint with the militia (the local police force). However, Morozov testified that he did not report the attack to the police. On cross-examination, Morozov attempted to reconcile these accounts by explaining that he and his wife went to report the incident together. Because he had a speech problem, his wife registered the complaint. The IJ was justified in concluding that Morozov had not

sufficiently explained why he earlier said he did not report the attack and that these inconsistencies undermined his credibility.

**PETITION DENIED.**

*Morozov v. Holder*, No. 06-75343

**PREGERSON**, Circuit Judge, dissenting:

Oleg Morozov ("Mr. Morozov") testified that he was badly beaten on August 26, 1998, by members of the Russian National Unity ("RNU")[1] organization because he is Jewish. While RNU members beat him, they repeatedly called him a "kike," and told him, "we will cleanse our Moscow from the so-called businessmen as [you]." They also told Mr. Morozov, "this Jewish musician sold Russia to the West, as did all other Jews, but [we will] not let [you] do that." Mr. Morozov testified that the men beat him so badly that it felt as though his "soul flew out of [his] body, hit the walls, and moved back again from that horror."

After this beating, Mr. Morozov returned home and his wife ("Mrs. Morozova") took him to the hospital, where he spent three days recovering. Even though Mr. Morozov did not want to report the incident to the authorities, the hospital called two police officers. When Mr. Morozov told the policemen what had happened, they asked if he knew the names of the men who beat him. Mr.

---

[1] The U.S. Department of State Country Report on Human Rights Practices in Russia for 1998, submitted in support of Mr. Morozov's asylum application, described the RNU as an "ultranationalist . . . paramilitary organization" with Anti-Semitic views. According to the Report, the RNU has contributed to Anti-Semitism in Russia, as "anti-Semitic themes continued to figure prominently in hundreds of [the RNU's] extremist publications, and some politicians made anti-Semitic remarks."

Morozov said he did not and "lost his patience" with the officers. Mr. Morozov testified that his wife wanted to report the incident to the "militia," but he did not want to because he believed the RNU had ties to the government. Nevertheless, Mr. Morozov went with his wife to report the incident to the "militia," and Mrs. Morozova, in the presence of her husband, registered a complaint.

After Mr. Morozov left the hospital, his persecutors made several attempts to find him. On one occasion, the RNU members parked themselves in front of Mrs. Morozova's parents' apartment. Mrs. Morozova and the couple's young daughter were walking to the apartment when they saw the RNU members and ran away. At that time Mrs. Morozova was twenty-one weeks pregnant. Two days later, she suffered a miscarriage. Shortly after the miscarriage in January 1999, Mr. and Mrs. Morozova and their daughter fled to the United States with nonimmigrant visas.

Mrs. Morozova testified that her husband suffered severe trauma and mental anguish as a result of his persecution by the RNU. In his declaration, Mr. Morozov stated that his "[f]ears and memories of past events were overwhelming. [He] felt even more fear that [he] would suffocate and [his] family would remain unprotected." Mrs. Morozova testified that each time they attempted to fill out the asylum application, her husband "became short of breath . . . turn[ed] very pale,

2

began coughing[,] . . . lost the ability to talk and he look[ed] very sick as a person unable to provide information."

### a. The Timeliness of Mr. Morozov's Asylum Application

The majority concluded that the Immigration Judge ("IJ") correctly determined that Mr. Morozov failed to present an extraordinary circumstance that would warrant a late asylum application. I disagree.

On the contrary, Mr. Morozov presented substantial evidence that during the one-year period after the Morozovs arrived in the United States, Mr. Morozov suffered from extreme depression and serious mental illness because of the "persecution [and] violent harm [he] suffered in the past." 8 C.F.R. § 208.4(a)(5)(I).

The record indicates that Mr. Morozov was barely able to hold a job as a dishwasher, and was fired from this job because of his inability to perform his duties. Contrary to the IJ's incorrect finding, there is no evidence in the record that Mr. Morozov ever said he held a job cleaning houses. Furthermore, the IJ's conclusion that Mr. Morozov's serious mental illness did not preclude him from filing an asylum application within one year of his arrival in the United States was contrary to the evidence. The IJ based this incorrect conclusion on her finding that Mr. Morozov was still able to perform certain mundane tasks. This conclusion

3

reflects a specious understanding of the effects of the post-traumatic stress disorder that afflicted Mr. Morozov. While he may have been able to obtain a driver's license and visa extension, the IJ failed to recognize that Mr. Morozov's severe anxiety and depression were triggered when the asylum application required him to recount his past persecution at the hands of the Anti-Semitic RNU. The IJ's conclusion that there were no extraordinary circumstances that excused Mr. Morozov's late filing is contrary to the language of 8 C.F.R. § 208.4(a)(5)(I) (listing "[s]erious illness or mental or physical disability, including any effects of persecution or violent harm suffered in the past, during the 1-year period after arrival" as an "extraordinary circumstance" that excuses a late asylum application). Thus, the IJ's conclusion is not supported by substantial evidence.

### b. Adverse Credibility

I also disagree with the majority's conclusion that substantial evidence supports the IJ's adverse credibility finding.

First, although the IJ stated that Mr. Morozov was hostile on cross-examination, the IJ did not indicate that she relied on this observation when she made her adverse credibility finding. *See Arulampalam v. Ashcroft*, 353 F.3d 679, 686 (9th Cir. 2003); *see also Osorio v. INS*, 99 F.3d 928, 931 (9th Cir. 1996) ("[The IJ] must have a legitimate articulable basis to question the petitioner's

4

credibility, and must offer a specific, cogent reason for any stated disbelief.") (internal quotation marks omitted). The IJ talked about Mr. Morozov's demeanor in a section entitled "Demeanor," a section separate from her "Credibility" discussion. Nowhere in her written decision did the IJ state that Mr. Morozov's demeanor led her to believe he was not credible. The IJ's observations indicate that Mr. Morozov appeared upset with the questions put to him on cross-examination. Although we give "special deference" to the IJ's credibility determinations based on an applicant's demeanor, *Singh-Kaur v. INS*, 183 F.3d 1147, 1151 (9th Cir. 1999), the IJ's demeanor-credibility finding must be "substantial and bear a legitimate nexus to the [adverse credibility] finding." *Salaam v. INS*, 229 F.3d 1234, 1238 (9th Cir. 2000) (internal quotation marks omitted). Because the IJ did not link her observations about Mr. Morozov's behavior on cross examination to a conclusion that Mr. Morozov was not credible, I cannot conclude that there is substantial evidence to support an adverse credibility finding on this basis.

Second, the IJ did not give a specific and cogent reason for rejecting Mr. Morozov's reasonable explanation for a perceived discrepancy about whether he reported the August 26, 1998, attack. *See Soto-Olarte v. Holder*, 555 F.3d 1089, 1091 (9th Cir. 2009) ("An adverse credibility finding is improper when an IJ fails

5

to address a petitioner's explanation for a discrepancy or inconsistency.") (internal citation omitted). The IJ stated only that Mr. Morozov was "not able to explain why he had testified earlier that he did not report [the incident to the militia]." However, as discussed below, Mr. Morozov did provide a reasonable explanation for the perceived discrepancy.

"This court has recognized that asylum applications are frequently filled out by poor, illiterate people who do not speak English and are unable to retain counsel, and who may seek the assistance of preparers." *Alvarez-Santos v. I.N.S.,* 332 F.3d 1245, 1254 (9th Cir. 2003) (internal citations and quotation marks omitted). Additionally, "asylum forms filled out by . . . people who . . . are unable to retain counsel should be read charitably . . . ." *Smolniakova v. Gonzales*, 422 F.3d 1037, 1045 (9th Cir. 2005) (internal quotation marks omitted).

Here, Mr. Morozov did not have the benefit of counsel, nor could he read, write, or speak English. Mr. Morozov was only able to sign and submit an asylum application after a Russian-speaking friend filled out the application for him in English. In this application, the friend wrote that Mr. Morozov reported the August 26, 1998, attack to the "militia." At the hearing before the IJ, where there was an interpreter, Mr. Morozov provided details that clarified this statement in the application. In response to a question by his counsel, Mr. Morozov explained that

he did not "consider" reporting the beating to the Russian authorities because he did not believe that they would do anything to help. But Mrs. Morozova insisted they report the incident to the "militia." Thus, it was Mrs. Morozova who actually reported the incident, while Mr. Morozov sat there silently. The statements in Mr. Morozov's asylum application are therefore not *inconsistent* with his later, more detailed explanation. Moreover, the IJ did not address or explain why she rejected Mr. Morozov's reasonable explanation for the perceived discrepancy, and thus her adverse credibility finding on this basis is improper. *See Soto-Olarte*, 555 at 1091.

Because I do not believe that the IJ's adverse credibility finding is supported by substantial evidence, I would grant Mr. Morozov's petition for review and remand to the BIA for further proceedings to determine whether, accepting Mr. Morozov's testimony as credible, he is eligible for relief. *See Singh v. Gonzales*, 439 F.3d 1100, 1113 (9th Cir. 2006). Accordingly, I dissent.

7